# In the
# United States Court of Appeals
## for the Seventh Circuit

JEFFREY DUBNOW,

*Plaintiff-Appellant,*

v.

DENIS R. MCDONOUGH, Secretary of Veterans Affairs,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois – Eastern Division, No. 1:19-cv-02423.
The Honorable **Virginia M. Kendall**, Judge Presiding.

## BRIEF AND SHORT APPENDIX OF
## PLAINTIFF-APPELLANT JEFFREY DUBNOW

JAMIE A. GLIKSBERG
MICHAEL D. FRISCH
CROKE FAIRCHILD
MORGAN & BERES LLC
180 North LaSalle Street
Suite 2750
Chicago, IL 60601
(312) 768-4700

ALAN W. NICGORSKI
HANSEN REYNOLDS LLC
150 South Wacker Drive
24th Floor
Chicago, IL 60606
(312) 265-2252

NEIL LLOYD
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5500

*Counsel for Plaintiff-Appellant
Jeffrey Dubnow*



## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-1045

Short Caption: Dubnow v. Wilkie

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jeffrey Dubnow, M.D.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hansen Reynolds LLC, Croke Fairchild Morgan & Beres, Schiff Hardin LLP, Legal Lion Employment Law Firm,

and Handler Law Group.

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

n/a

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Jamie A. Gliksberg      Date: 05/18/2021

Attorney's Printed Name: Jamie A. Gliksberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 180 N. LaSalle St., Ste 2750, Chicago, IL 60601

Phone Number: 847-757-8385      Fax Number: 312-268-6285

E-Mail Address: jgliksberg@crokefairchild.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-1045

Short Caption: Dubnow v. Wilkie

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jeffrey Dubnow, M.D.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hansen Reynolds LLC, Croke Fairchild Morgan & Beres, Schiff Hardin LLP, Legal Lion Employment Law Firm,

and Handler Law Group.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Michael D. Frisch    Date: 05/18/2021

Attorney's Printed Name:  Michael D. Frisch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✔]

Address:  180 N. LaSalle St., Ste 2750, Chicago, IL 60601

Phone Number: 847-530-7419    Fax Number:  312-268-6285

E-Mail Address: mfrisch@crokefairchild.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-1045

Short Caption: Dubnow v. Wilkie

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Jeffrey Dubnow, M.D.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Hansen Reynolds LLC, Croke Fairchild Morgan & Beres, Schiff Hardin LLP, Legal Lion Employment Law Firm and

   Handler Law Group

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      Not Applicable

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      Not Applicable

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   Not Applicable

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   Not Applicable

Attorney's Signature: /s/ Alan W. Nicgorski    Date: 01/15/2021

Attorney's Printed Name:  Alan W. Nicgorski

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  Hansen Reynolds LLC

   150 S. Wacker Dr., 24th Floor, Chicago, IL 60606

Phone Number: 312-265-2252    Fax Number:  414-273-8476

E-Mail Address: anicgorski@hansenreynolds.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-1045

Short Caption: Dubnow v. McDonough

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☑   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Jeffrey Dubnow

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Neil Lloyd, Schiff Hardin LLP

(3)   If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Neil Lloyd          Date: May 21, 2021

Attorney's Printed Name:  Neil Lloyd

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  233 S. Wacker Dr., Ste. 7100

      Chicago, IL

Phone Number: 312-258-5500          Fax Number:  312-258-5600

E-Mail Address: nlloyd@schiffhardin.com

rev. 12/19 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ............................................................ i

TABLE OF AUTHORITIES ............................................................................................ vi

JURISDICTIONAL STATEMENT ................................................................................... 1

STATEMENT OF THE ISSUES ....................................................................................... 2

STATEMENT OF THE CASE .......................................................................................... 5

    I.      BACKGROUND ............................................................................... 5

    II.     THE APRIL 29, 2017 INCIDENT ..................................................... 6

    III.    DR. DUBNOW'S TERMINATION ................................................... 9

    IV.   THE DISCIPLINARY APPEALS BOARD'S REVERSAL OF THE
          TERMINATION ............................................................................. 10

    V.     THE PDUSH'S REMAND AND SUBSEQUENT REVERSAL ON
          CHARGE 1 ..................................................................................... 12

    VI.    THE DISTRICT COURT'S AFFIRMANCE ..................................... 15

SUMMARY OF ARGUMENT ........................................................................................ 15

ARGUMENT ................................................................................................................ 18

    I.      THE PDUSH DID NOT REVIEW THE DAB'S DECISION
          UNDER THE "CLEARLY CONTRARY TO THE EVIDENCE"
          STANDARD, REQUIRING REVERSAL OR REMAND ............................. 18

    II.     THE PDUSH DISREGARDED THE STANDARD OF CARE,
          REQUIRING REVERSAL ................................................................. 25

CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abaqueta v. United States,*
255 F. Supp. 2d 1020 (D. Ariz. 2003) .......................................................................... 24

*Barnett v. Barnhart,*
381 F.3d 664 (7th Cir. 2004) ....................................................................................... 29

*Beck v. Shinseki,*
No. CV 113-126, 2015 WL 1202196 (S.D. Ga. Mar. 16, 2015) ................................... 24

*Biestek v. Berryhill,*
139 S. Ct. 1148 (2019) ................................................................................................ 20

*Brindisi v. Barnhart,*
315 F.3d 783 (7th Cir. 2003) ....................................................................................... 30

*Holmstrom v. Metro. Life Ins. Co.,*
615 F.3d 758 (7th Cir. 2010) ....................................................................................... 30

*Jackson v. Blitt & Gaines, P.C.,*
833 F.3d 860 (7th Cir. 2016) ....................................................................................... 19

*Kastner v. Astrue,*
697 F.3d 642 (7th Cir. 2012) ........................................................................... 20, 23, 29

*Kreso v. Shineski,*
67 F. Supp. 3d 1235 (D. Colo. 2014) ........................................................................... 30

*Martin v. Dep't of Veterans Affairs,*
5:16-cv-05562, 2017 WL 3841895 (S.D. W.Va. Sept. 1, 2017) .................................... 18

*Metro. Life Ins. Co. v. Glenn,*
554 U.S. 105 (2008) ..................................................................................................... 30

*Minnick v. Colvin,*
775 F.3d 929 (7th Cir. 2015) .................................................................................. 18, 20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................................................. 20, 27

*NLRB v. Brown,*
380 U.S. 278 (1965) ..................................................................................................... 23

*Olenhouse v. Commodity Credit Corp.,*
    42 F.3d 1560 (10th Cir. 1994) ........................................................ 30

*Savu v. United States of America, et al.,*
    No. SA18CV00993JKPESC, 2021 WL 1615562 (W.D. Tex. Apr. 26, 2021) ....... *passim*

*Shideler v. Astrue,*
    688 F.3d 306 (7th Cir. 2012) ........................................................ 18

*Walsh v. Chez,*
    583 F.3d 990 (7th Cir. 2009) ........................................................ 25

**Statutes & Other Authorities:**

5 U.S.C. §§ 701-706 ........................................................................ 1

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

38 U.S.C. § 7401(1) ................................................................. *passim*

38 U.S.C. § 7461 ........................................................................... 10

38 U.S.C. § 7461(b)(1) ...................................................................... 5

38 U.S.C. § 7462 ................................................................... 5, 10, 24

38 U.S.C. § 7462(a)(1) ......................................................... 2, 24, 25-26

38 U.S.C. § 7462(c)(2) ..................................................................... 10

38 U.S.C. § 7462(d) ............................................................... *passim*

38 U.S.C. § 7462(d)(1) ..................................................................... 21

38 U.S.C. § 7462(d)(2) ........................................................... 5, 18, 23

38 U.S.C. § 7462(d)(2)(A) .................................................................. 12

38 U.S.C. § 7462(d)(4) ..................................................................... 18

38 U.S.C. § 7462(f) .......................................................... 5, 15, 18, 19

38 U.S.C. § 7462(f)(1) ...................................................................... 1

38 U.S.C. § 7462(f)(C) ..................................................................... 30

38 U.S.C. § 7464 ................................................................... 2, 10, 24

Fed. R. App. P. 30(a) ........................................................................ 5

## Jurisdictional Statement

**District Court Jurisdiction.**  The district court had jurisdiction under 28 U.S.C. § 1331.  Dr. Dubnow sought review under 38 U.S.C. § 7462(f)(1) and the Administrative Procedure Act (5 U.S.C. §§ 701-706) of a final administrative action removing him from his federal service position as Chief of the Emergency Department at Captain James A. Lovell Federal Health Care Center in North Chicago, Illinois.

**Appellate Court Jurisdiction.**  This Court has appellate jurisdiction under 28 U.S.C. § 1291.  The final judgment in this matter was entered on November 12, 2020.  One of the parties is an officer of the United States sued in his official capacity.  Dr. Dubnow timely appealed on January 8, 2021.

1.      In Chapter 74 of Title 38 of the United States Code, Veterans Health Administration – Personnel, Congress provided detailed rules for the disciplining of Department of Veterans Affairs ("VA") employees and for those employees' review of disciplinary actions. Physicians are classified as Section 7401(1) employees. Under Section 7462(a)(1), a Disciplinary Appeals Board ("DAB") appointed under Section 7464 "shall have exclusive jurisdiction to review any case – (A) which arises out of (or which includes) a question of professional conduct or competence of a section 7401(1) employee; and (B) in which a major adverse action was taken." Under Section 7464, the DAB shall consist of three VA employees, each in the same or a superior grade to the employee appealing the adverse action and at least two of whom shall be employed in the same category as the employee who is appealing the adverse action. In turn, under Section 7462(d), the VA Secretary conducts a two-step review of a DAB's recommendation. *First*, the VA Secretary must "resolv[e] any question as to whether the matter involves professional conduct or competence." *Second*, if the matter does involve professional conduct or competence, the Secretary may reverse the DAB's decision, *only if* the Secretary finds the decision "to be clearly contrary to the evidence or unlawful." By regulation, the Deputy Under Secretary for Health ("PDUSH") has delegated authority to exercise Section 7462(d) review.

Dr. Jeffrey Dubnow, a VA Section 7401(1) employee, was charged with inappropriately refusing care to an infant in cardiorespiratory arrest by diverting an ambulance en route to the Emergency Department at the Captain James H. Lovell Federal Health Care Center ("FHCC") to a nearby trauma center at Lake Forest Hospital. The infant was not able to be resuscitated and died. There is no dispute that the charge against Dr. Dubnow at issue in this case (Charge 1) involved an issue of professional conduct or competence. Dr. Dubnow was terminated based on the charge. On review, the DAB (comprised of three VA physicians) concluded that the charge was not sustained and recommended Dr. Dubnow's reinstatement because his conduct met the standard of care. The PDUSH overturned that finding, resulting in a final agency action of termination. The first question presented is whether Dr. Dubnow is entitled to have the DAB's finding concerning the charge enforced (or at a minimum to a remand to the PDUSH) when the PDUSH failed to conduct any meaningful analysis of the administrative record as a whole, much less identify how the DAB's conclusion was clearly contrary to the evidence.

2.      The DAB found that that the charge against Dr. Dubnow was not sustained because "[t]he community standard of care was met for this patient." The PDUSH said that this finding was "clearly contrary to the evidence" because (a) "the FHCC is staffed and equipped to handle pediatric cases, and equipment necessary to handle a pediatric resuscitation was available;" and (b) Dr. Dubnow and other staff members on duty "were Pediatric Advanced Life Support (PALS) certified." Instead of applying any standard of

care, the PDUSH focused on the tragic outcome of the case, writing "the egregiousness of the conduct as described in [the charge] justifies the penalty of removal given the circumstances of this case" (the patient died).  The second question presented is whether, under a statute providing expressly for review of matters of "professional conduct or competence" of physicians, it was arbitrary and capricious for the PDUSH to overturn the DAB's conclusion that Dr. Dubnow's conduct met the community standard of care, by effectively applying a rigid "no diversion if hospital is minimally qualified to handle the patient" rule divorced from the standard of care and that accordingly failed to consider the reasonableness of Dr. Dubnow's exercise of professional judgment in light of the facts and circumstances of the case.

This matter involves the propriety of the VA's termination of Dr. Jeffrey Dubnow, a physician appointed under 38 U.S.C. § 7401(1). Under Section 7461(b)(1), Dr. Dubnow appealed the termination and a three-member Disciplinary Appeals Board ("DAB") was constituted under Section 7462. After an evidentiary hearing, the DAB overturned the VA's termination decision, recommending reinstatement and other relief. (A-43-44.)[1]

On review under Section 7462(d)(2), the VA's Principal Deputy Under Secretary for Health ("PDUSH") reversed the DAB's decision, concluding that the DAB's finding with respect to Charge 1 was clearly contrary to the evidence. (A-15.) Dr. Dubnow timely sought judicial review under Section 7462(f). The district court affirmed the PDUSH's decision. (A-1.) Dr. Dubnow timely appealed.

## I.   BACKGROUND

Dr. Dubnow has been practicing emergency medicine since 1979. (D42-1 at 4.)[2] He is Board Certified in Emergency Medicine and licensed in four states, including Illinois. (*Id.*) In October 2011, Dr. Dubnow was hired to be the Chief of the Emergency Department at the Captain James A. Lovell Federal Health Care Center ("FHCC") in North Chicago, Illinois. (*Id.*) The FHCC is a joint venture of the VA and the Department of Defense and provides medical services to veterans as well as to active-duty military,

---

[1] Citations to the Fed. R. App. P. 30(a) appendix are in the form "A [page]."

[2] Citations to filings in the district court are in the form "D [page]," where the page is the number added by the cm/ecf system to the top of each document.

primarily those stationed at Great Lakes Naval Base and their family members. (*Id.*) Before his termination, Dr. Dubnow's 40-year medical career was free from discipline, malpractice judgments, or inquiries into his professional competence. (*Id.*) And he consistently received excellent performance reviews throughout his time at the FHCC. (*Id.* at 4-5.)

While at the FHCC, Dr. Dubnow advocated for the Emergency Department, his fellow physicians and staff, and patients. Specifically, he raised issues and concerns regarding the operation of the Emergency Department and their negative effects on patient care to FHCC leadership, the Office of Inspector General ("OIG"), Office of the Medical Inspector, Office of Special Counsel, and Congress. (D42-1 at 5.) Because he had raised legitimate concerns related to patient care and safety, the VA granted Dr. Dubnow whistleblower status. (A-18.) Before his removal, this status was disclosed to upper-level management at the FHCC, including Dr. Frank Maldonado (who proposed Dr. Dubnow's removal) and Director Stephen Holt (who upheld the charges to remove Dr. Dubnow), though neither was entitled to have this information. (A-18; D42-1 at 5.)

## II.  THE APRIL 29, 2017 INCIDENT

At approximately 2:02 p.m. on April 29, 2017, the FHCC Emergency Department received a call concerning a seven-month-old infant, who was found in full cardiorespiratory arrest at base housing located near the Great Lakes Naval Base and was being transported to the FHCC by a Department of Defense ambulance crew. (D42-1 at

6-8.)  Typically, incoming ambulance crews with high priority patients establish direct communication with the Emergency Department via two-way radio.  (*Id.* at 6.)  In this case, however, the call was received on the Emergency Department's general landline, which is ordinarily used only for non-emergency matters.  (*Id.*, *see also* A-18.)  The call was placed by the FHCC VA Police Department ("VAPD"), who was patching through the Department of Defense's Great Lakes EMS dispatcher, who, in turn, was relaying information from the ambulance crew to the VAPD dispatcher.  (D42-1 at 7.)  The atypical manner in which this call was received did not permit direct communication between the FHCC Emergency Department and the ambulance crew.  (A-18.)

Joseph Carney, an Intermediate Care Technician in FHCC's Emergency Department, received the call and gathered as much information as he could concerning the seven-month-old infant's condition, given the disjointed nature of the call.  (D42-1 at 7.)  Mr. Carney relayed the information that he was able to ascertain to Dr. Dubnow and another physician on duty, Dr. James Martin.  (*Id.* at 7-8.)  None of Dr. Dubnow, Dr. Martin, and Mr. Carney knew the ambulance's exact location; nor could they make that determination.  (A-18.)

Based on the available information, Dr. Dubnow and Dr. Martin concluded that the most likely cause for the infant's cardiorespiratory arrest was trauma, as opposed to sudden infant death syndrome ("SIDS") or another cause.  (A-28.)  Given this, Dr. Dubnow and Dr. Martin agreed that in their professional medical judgment it was in

the best interest of the patient to be transported directly to nearby Lake Forest Hospital.

(A-28, 30; D42-1 at 8.)  The FHCC Emergency Department had the basic equipment and

minimum level of skill necessary to attempt resuscitation of a pediatric patient, but the

staff lacked the experience and specialized training to care for pediatric patients in severe

trauma.  (D42-1 at 8; A-18, 30-32.)  By contrast, Lake Forest Hospital is a State of Illinois

designated Level II Trauma Center; has pediatric hospitalists, pediatric intensivists, and

pediatric surgeons on staff; and is capable of providing excellent pediatric emergency

and in-patient care.  (*Id.*)  Two minutes after the call came in (approximately 2:04 p.m.)

and based on Dr. Dubnow's and Dr. Martin's exercise of their professional medical

judgment, Mr. Carney told the VAPD and DOD EMS dispatchers that the ambulance

should proceed directly to Lake Forest Hospital.  (D42-1 at 8; A-18.)

Nonetheless, seconds after Mr. Carney gave this direction, he noticed on the video

monitor that the ambulance had already arrived at the FHCC's ambulance bay.  (D42-1

at 8.)  Mr. Carney informed Dr. Dubnow and the rest of the staff, who immediately

prepared to receive the patient and attempt resuscitation.  (*Id.*; A-18.)  The ambulance,

however, left the FHCC ambulance bay and transported the patient to Lake Forest

Hospital without further communication and without presenting the patient to the

Emergency Department.  (D42-1 at 8-9; A-18.)  As noted, The FHCC Emergency

Department had no means to communicate directly with the ambulance crew.  (*Id.*)

Tragically, the patient could not be resuscitated either by the ambulance crew en route or

upon arrival at Lake Forest Hospital. (A-31). EMS records show that the infant was not breathing when the ambulance crew arrived at the child's home, and possibly had not been breathing for 12-22 minutes prior to the crew's arrival. (D42-1 at 6n.10.) The child was pronounced dead at 2:46 p.m. at Lake Forest Hospital. (A-26.)

### III. DR. DUBNOW'S TERMINATION

On May 5, 2017, the VA reassigned Dr. Dubnow from his position as Chief of the Emergency Department to a position as a non-supervisory physician with full clinical privileges, while the FHCC investigated the April 29, 2017 incident. (D42-1 at 9-10.) A VA Administrative Investigative Board ("AIB") was charged with investigating "[a]lleged inappropriate refusal of care or diversion of persons seeking care" from the FHCC Emergency Department. (D19 at 309.) The AIB was authorized to "inquire into all aspects of this matter; to require VA employees to cooperate with you; [and] to require all employees having knowledge of the complaint to furnish testimony under oath or affirmation." (*Id*.) Apart from Dr. Dubnow, the AIB did not interview the ambulance crew, Mr. Carney, Dr. Martin, or any other participants or witnesses to the events of April 29, 2021. (D42-1 at 12.) The AIB found the ambulance diversion on April 29, 2017 to be contrary to FHCC and VA policies. (D19-1 at 186 – 191.)

Relying on the AIB's report, Dr. Maldonado (the FHCC's Chief Medical Executive, who had also learned of Dr. Dubnow's whistleblower status, though he was not entitled to that information) recommended that Dr. Dubnow be removed from federal service and

that his clinical privileges be revoked. (D19-1 at 219-22.) Specifically, Dr. Maldonado supported his proposal with five "charges" – three related to the April 29, 2017 incident and two concerning other events. (*Id.*) Dr. Stephen Holt (the Director of the FHCC, who had also learned of Dr. Dubnow's whistleblower status, though he also was not entitled to that information) accepted Dr. Maldonado's proposal and, as the deciding official, Dr. Holt subsequently terminated Dr. Dubnow's employment effective December 24, 2017. (D19-1 at 405, 408-10.)

## IV. THE DISCIPLINARY APPEALS BOARD'S REVERSAL OF THE TERMINATION

Pursuant to 38 U.S.C. §§ 7461 and 7462, Dr. Dubnow timely appealed the VA's termination of his employment to a Disciplinary Appeals Board ("DAB"). (D42-1 at 15.) Sections 7461 and 7462 provide that Section 7401(1) employees (including physicians, like Dr. Dubnow) who are subject to a "major adverse action" that arises out of "a question of professional conduct or competence" have the right to appeal to a DAB. As noted, the DAB must be comprised of three employees of the VA, "each of whom shall be of the same grade as, or be senior in grade to, the employee who is appealing an adverse action" and at least two members of the DAB "shall be employed in the same category of position as the employee who is appealing the adverse action." 38 U.S.C. § 7464. The DAB must provide the employee with an oral hearing, and much like a trial court, has the ability to administer oaths and receive live testimony. 38 U.S.C. §§ 7462, 7464. At the conclusion

of the hearing, the DAB may approve the action as imposed; approve the action with modification, reduction, or exception; or reverse the action. 38 U.S.C. § 7462(c)(2).

The VA appointed a DAB consisting of three senior VA physicians. The DAB held a three-day hearing on Dr. Dubnow's appeal from April 10-12, 2018, which included testimony from 13 witnesses. (D42-1 at 18.) After considering the evidence, the DAB issued an initial 26-page decision on May 25, 2018, concluding that none of the five charges was sustained in whole or in part. (*Id.* at 18-19; D19-6 at 7-33.)

Concerning the three April 29, 2017 incident charges, the DAB questioned the thoroughness and impartiality of the AIB's investigation and findings because the AIB did not interview several critical witnesses, including the ambulance crew, Mr. Carney, and Dr. Martin. (D19-6 at 9-14.) The DAB found that Dr. Dubnow's decision to divert the ambulance to Lake Forest Hospital was a reasonable exercise of his medical judgment given the limited information that he had about the patient and the inability of the Emergency Department to communicate directly with the ambulance crew. (*Id.* at 8, 16-19.) The DAB noted that the FHCC Emergency Department had no experience treating this type of patient, in contrast to the nearby, trauma-certified, Lake Forest Hospital. (*Id.*) The DAB further found that Dr. Dubnow's decision was consistent with FHCC practice of allowing Emergency Department physicians discretion to divert incoming patients to another facility when in the best interest of the patient. (*Id.* at 23, 25, 27.) Finally, the DAB noted that once Dr. Dubnow and the FHCC Emergency Department Staff became aware

that the ambulance had already arrived at FHCC, they prepared to receive the patient and begin efforts at resuscitation. (*Id.* at 8, 24.) Yet, the ambulance drove away without further communication. (*Id.*) Thus, there was no refusal to provide care as the patient was never presented to the FHCC Emergency Department.

Because it did not sustain any of Charges 1-3 (the three April 29, 2017 incident charges) or either of the two unrelated charges,[3] the DAB recommended that Dr. Dubnow be reinstated with full restitution of lost wages and benefits, that his record be expunged of the disciplinary action, that he be fully reimbursed for any and all reasonable expenses incurred to defend himself in the disciplinary proceedings, and that Dr. Dubnow's revocation/reduction in clinical privileges not be reportable to the National Practitioner Data Bank. (*Id.* at 32.)

## V.     THE PDUSH'S REMAND AND SUBSEQUENT REVERSAL ON CHARGE 1

Pursuant to the 38 U.S.C. § 7462(d), the DAB's decision is subject to review and approval by the PDUSH. The PDUSH may reverse the DAB only if its decision is "clearly contrary to the evidence or unlawful." 38 U.S.C. § 7462(d)(2)(A). In this case, the PDUSH initially remanded the matter to the DAB "for further consideration because the Board's rationale regarding the decision not to sustain the charges is insufficient." (D19-6 at 35.) Specifically, the PDUSH requested that the DAB "elaborate on its analysis regarding the

---

[3] At the DAB hearing, the VA did not offer evidence to prove charges 4 and 5, focusing instead on charges 1-3 (all related to the April 29, 2017 incident).

conclusion that the diversion of the patient was acceptable, focusing on the fact that a fully trained, Board Certified ER physician should have been able to provide care to an infant." (*Id.*) The PDUSH further stated that the DAB "needs to elaborate on its conclusion that it was acceptable for [Dr. Dubnow] to assume the cardiac arrest was trauma related, and why an assessment of the patient was not warranted before reaching that conclusion." (*Id.*)

On September 11, 2018, the DAB reaffirmed its original decision and amended the Board Action ("Final Board Action") to include additional support for its findings and to address the specific issues raised by the PDUSH's remand order. (A-17-45.[4]) In particular, the DAB agreed that it was reasonable and met the standard of care for Dr. Dubnow to determine that the most likely cause of the infant's arrest was trauma, and therefore the infant would receive better care at a trauma center. (A-28, 35). The DAB emphasized the short distance to Lake Forest Hospital and the fact that a fully-trained ambulance crew would be expected to be able to provide a secure airway and chest compressions during transport, so that "the time required to travel to Lake Forest Hospital was not a critical factor in determining the outcome of the resuscitation effort." (A-20-21.) Further, the DAB again pointed to the lack of any opportunity for direct contact between the ambulance crew and the Emergency Department, given the necessity

---

[4] The Administrative Record filed by the VA (*see* D19) included only the original DAB Board Action (D19-6 at 7-33). Dr. Dubnow provided a copy of the Final Board Action as an exhibit to his Complaint, *see* D1-1 at 19-47.

of communicating through multiple intermediaries. (A- 27.) In light of the circumstances, the DAB found that "the limited information" available – that "the patient was a seven-month infant in cardiac arrest – was enough for Dr. Dubnow to conclude that the FHCC Emergency Department was not the best place for this child to be treated" and that it would be better for the patient to be treated at Lake Forest Hospital, "a center a few minutes away which [Dr. Dubnow] believed superiorly capable to care for a pediatric patient." (*Id.*) The DAB further found that any attempt to elicit additional information from the ambulance crew would only serve to delay efforts "to transport the baby to the best facility as quickly as possible." (A-27-28.)

The PDUSH overturned the DAB's decision as to Charge 1 ("Inappropriate Refusal of Care and/or Diversion"). Charge 1 stated:

> Inappropriate Refusal of Care and/or Diversion. Specification: On or about April 29, 2017, at approximately 2:01 p.m., you inappropriately refused care to and/or diverted a seven-month-old infant in full cardiac arrest en route via ambulance to the FHCC Emergency Department (ED) to Lake Forest Hospital which delayed potentially life-saving treatment. The infant was pronounced dead at 2:46 p.m. at Lake Forest Hospital.

(A-26 (underscoring removed for ease of reading).) The PDUSH concluded that the DAB's finding as to this charge was "clearly contrary to the evidence."[5] Specifically, the PDUSH stated:

> The Captain James H. Lovell Federal Health Care Center (FHCC) not only serves Veterans but also family members housed at the military base. As such, the FHCC is staffed and equipped to handle pediatric cases, and

---

[5] The PDUSH did not reverse the DAB's findings as to Charges 2, 3, 4 and 5.

equipment necessary to handle pediatric resuscitation was available. Additionally, you and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified, and as such, there was no need to divert the ambulance to another facility. The evidence shows that your decision was not justified, and created a serious situation that negatively impacted patient care. […] I find the egregiousness of the conduct as described in Charge 1 justifies the penalty of removal given the circumstances of this case.

(A-15-16.)

## VI.    THE DISTRICT COURT'S AFFIRMANCE

Dr. Dubnow sought judicial review of the PDUSH's reversal of the DAB's decision pursuant to 38 U.S.C. § 7462(f). The district court affirmed. (A-1.)

## SUMMARY OF ARGUMENT

This appeal raises two issues of first impression in this Circuit involving the review of adverse personnel actions of certain VA professionals (here, a physician).

*First*, the VA Secretary (through the PDUSH under delegated authority) may overturn the findings of a DAB only when they are "clearly contrary to the evidence or unlawful," a standard appearing nowhere else in the United States Code and which has been interpreted by a single district court decision. Under a proper articulation and application of that standard, was the PDUSH's decision to overturn the DAB's rejection of the charges against Dr. Dubnow appropriate?

*Second*, the DAB must be comprised of three peer physicians; its authority is confined to circumstances involving a question of *professional* conduct or competence of a Section 7401(1) employee; and it has "exclusive jurisdiction" within the scope of its

15

authority to review adverse actions. Can the PDUSH overturn a DAB finding that a physician's conduct *met* the standard of care by ignoring the standard of care entirely?

Dr. Dubnow submits that the answer to both questions must be "no." Congress imposed the "clearly contrary to the evidence or unlawful" standard as a constraint on the Secretary's review of the DAB's findings. As the single district court applying this standard has held, reversal of the DAB is only appropriate when there is a "conflict between the [DAB's] decision and the weight of the evidence presented at the hearing [that] would be obvious to an ordinary person." *Savu v. United States of America, et al.*, No. SA18CV00993JKPESC, 2021 WL 1615562, at *2 (W.D. Tex. Apr. 26, 2021). Certainly the PDUSH's final agency action acknowledged the clearly contrary standard, but "[m]erely parroting the standard without showing its application renders review of a DAB decision arbitrary and capricious." *Id.* at *6. Proper review by the Secretary instead requires "articulat[ing] *how* the [DAB's] decision conflicts with the weight of the evidence at the hearing." *Id.* at *2 (emphasis added). The PDUSH's final agency action failed to acknowledge *any* of the evidence supporting the DAB's finding, much less how the DAB's finding that Dr. Dubnow's conduct met the standard of care *conflicted* with the weight of the evidence.

And there is a further restraint on the Secretary's review: the DAB's exclusive jurisdiction is limited to questions of professional competence and the conduct of a discrete category of professionals (Section 7401(1) employees), which includes

physicians. In a run of the mill legal or medical malpractice case, a plaintiff cannot reach a jury without expert testimony concerning the standard of care. Here, the DAB *was comprised of* other physicians. And for a reason. Congress did not provide the Secretary with discretion to fire physicians based solely on bad outcomes, even tragic ones like the death of an infant. As the DAB noted, "[g]ood and proper medical decisions sometimes end with bad results." (A-31.) The PDUSH's decision is entirely bereft of any attempt to define a standard of care or of any analysis showing how Dr. Dubnow's conduct failed to meet it. Instead, its results-driven decision is the antithesis of review under a professional judgment standard. For the PDUSH, it was enough that Dr. Dubnow was certified, the FHCC had the minimal level of equipment; but the infant was diverted to another hospital, and the infant died. Nowhere in the PDUSH's final administrative action is the recognition that Dr. Dubnow was necessarily exercising professional judgment when he concluded that the infant had likely arrested "secondary to trauma and not SIDS" (A-28) and that Lake Forest Hospital's nearby trauma center was a more appropriate facility than FHCC for such a patient, much less that this judgment *met* the community standard of care. Instead, the PDUSH concluded, "I find the egregiousness of the conduct as described in Charge 1 justifies the penalty of removal given the circumstances of this case." (A-16.) But simply labeling Dr. Dubnow's conduct "egregious" without evaluating that conduct against the standard of care is quintessential standardless decision making, and therefore plainly arbitrary and capricious.

## ARGUMENT

**I.  THE PDUSH DID NOT REVIEW THE DAB'S DECISION UNDER THE "CLEARLY CONTRARY TO THE EVIDENCE" STANDARD, REQUIRING REVERSAL OR REMAND**

The PDUSH's decision to reverse the DAB and uphold the termination of Dr. Dubnow represented the final administrative action in his case.  38 U.S.C. § 7462(d)(4). This Court reviews the PDUSH's decision directly on a *de novo* basis, giving no deference to the district court's decision.  *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  This Court should overturn the decision if it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence."  38 U.S.C. § 7462(f).  "The Court's review under this section directly mirrors the standards for judicial review of other administrative actions," and analogous administrative law precedents are applicable. *Martin v. Dep't of Veterans Affairs*, 5:16-cv-05562, 2017 WL 3841895, *3 (S.D. W.Va. Sept. 1, 2017) (internal citations and quotations omitted).

But unlike ordinary administrative review cases, this case concerns an adverse employment action of a VA professional and Congress has imposed additional standards. Specifically, because the decision under review involves the PDUSH's reversal of the DAB, this Court's review must ensure that the PDUSH himself complied with the Congressional directive that a DAB decision may be reversed only when it is "clearly contrary to the evidence."  38 U.S.C. § 7462(d)(2).  The phrase "clearly contrary to the

evidence" does not appear elsewhere in the United States Code.  Neither the statute nor VA rules and regulations interpret it; nor until recently had any court substantively considered this language.[6]

When confronted with unfamiliar text, this Court "start[s] with the text of the statute to ascertain its plain meaning." *Jackson v. Blitt & Gaines*, P.C., 833 F.3d 860, 863 (7th Cir. 2016).  This was the approach taken by the only court yet to interpret the "clearly contrary to the evidence" standard.  *Savu v. United States of America, et al.*, No. SA18CV00993JKPESC, 2021 WL 1615562 (W.D. Tex. Apr. 26, 2021) (vacating the PDUSH's reversal of the DAB).  There, the court relied on the dictionary definitions of "clearly" and "contrary to the evidence" to conclude that a DAB decision may be reversed only if "the conflict between the Board's decision and the weight of the evidence presented at the hearing would be obvious to an ordinary person."  *Id.* at *2.  As the *Savu* court observed: "It is apparent Congress intended to limit the ability to reverse the decision of a DAB by requiring application of the 'clearly contrary to the evidence' standard of review set forth in § 7462(d)."  *Id.* at *6.

This Court should take the same approach and hold that the PDUSH may reverse the DAB only when "the conflict between the Board's decision and the weight of the

---

[6] Prior to the *Savu* decision, discussed below, the district court's decision in this case was the only reported decision where judicial review was sought under 38 U.S.C. § 7462(f) of the PDUSH's *reversal* of a DAB decision.  All other reported cases involved instances of the PDUSH adopting the DAB's decision.

evidence presented at the hearing would be obvious to an ordinary person." *Id.* at *2. Or put another way, when no reasonable person would agree with the DAB's decision given the weight of the evidence in the record.

In addition to meeting the standard under Section 7462(d), the VA's final decision must also comport with traditional principles of agency decision making. Courts will not "simply rubber stamp" an administrative decision "without a critical review of the evidence." *Minnick*, 775 F.3d at 935. An agency's decision is arbitrary and capricious if it does not articulate any "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation and citation omitted). A rational connection is articulated by making findings that support the decision and supporting those findings with "substantial evidence," (*id.* at 44), meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation and citation omitted). In order to allow for meaningful judicial review, an administrative decisionmaker must provide an opinion that provides an "an accurate and logical bridge" between the administrative record and his or her decision. *See Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The PDUSH did not apply the "clearly contrary to the evidence" standard. He failed to articulate how the DAB's decision conflicted with the weight of the evidence, instead substituting his judgment for that of the DAB. Accordingly, the Court should

reverse the PDUSH's decision and direct the PDUSH to adopt the DAB's decision pursuant to 38 U.S.C. § 7462(d)(1) or at a minimum remand the decision for a proper review under the clearly contrary to the evidence standard.

After a three-day hearing that included the testimony from 13 witness, the DAB found that Dr. Dubnow's decision to divert the ambulance was appropriate in light of the limited facts known to him at the time and in his professional judgment that the diversion was in the best interest of the patient. (A-26-31.) Specifically, as explained in its 29-page amended decision, the DAB concluded that based on what Dr. Dubnow knew at the time about the location of the ambulance and his clinical experience, he reasonably believed that nearby Lake Forest Hospital was the "most appropriate facility to treat the patient" compared to the FHCC. (A-27.) The DAB agreed with Dr. Dubnow's medical judgment that (based on the facts that he had), the cause of the infant's cardiorespiratory arrest was likely trauma, and therefore that the infant would receive better care at a trauma center like Lake Forest Hospital. (A-28, 36). The DAB concluded that this decision was bolstered by the fact that the FHCC had no pediatrician on staff who could manage the patient if he had been resuscitated and had no pediatric ICU, meaning that the patient would have ultimately been transferred to another facility like Lake Forest Hospital in a fragile condition, which would have increased risk for the patient. (A-29.) Indeed, the FHCC Emergency Department had never handled a pediatric or infant cardiac arrest. (A-29-30.)

The DAB panel of three physicians therefore concluded: "The community standard of care was met for this patient by the decision to redirect the ambulance." (A-30.)[7]

The PDUSH brushed this extensive evidentiary record aside. Instead, he substituted his own judgment for the DAB's, concluding that since the FHCC was qualified to handle a patient, Dr. Dubnow was categorically unjustified in diverting him to another hospital. This flies in the face of the VA-specific "clearly contrary to the evidence" standard and flunks the Administrative Procedure Act as well.

As for the VA-specific standard, the PDUSH did not explain *how* the DAB's decision was "clearly contrary to the evidence," *i.e.*, that there was an "obvious" conflict between the DAB's decision and the "weight of the evidence presented at the hearing." *Savu*, 2021 WL 1615562, at *2. To be sure, the PDUSH mouthed the proper legal test, but there is no basis to support the conclusion that he *considered* the evidence relied upon by the DAB, much less that he refuted the DAB's reasoning or explained why its decision was unsupported. *Savu*, 2021 WL 1615562, at *6 ("Merely parroting the standard without showing its application renders review of a DAB decision arbitrary and capricious."). Instead, the PDUSH rejected the DAB by effectively holding that the Emergency Department can never divert a patient that it has the minimum capability to treat, even

---

[7] The DAB further found that the diversion did not violate any VA or FHCC policies and procedures and was in fact consistent with the long-standing, and senior leadership-approved, FHCC practice of allowing Emergency Department physicians to exercise their discretion on a case-by-case basis to divert patients to another facility where they can receive better care. (A-31-42.)

when medical professionals believe that patient is better off going elsewhere.  Notably, the DAB itself recognized that the FHCC Emergency Department had the minimum capability to treat an infant in cardiorespiratory arrest, but – based on a detailed consideration of the record evidence as a whole – found that Dr. Dubnow's decision to divert the patient to a facility where he could receive better care was reasonable and within the community standard of care.  (A-18, 26-31.)

Further, because of the narrow standard in Section 7462(d), it is all the more important that the PDUSH clearly articulate how the DAB's decision conflicted with the evidence presented at the hearing to ensure meaningful appellate review.  *See generally Kastner*, 697 F.3d at 646 (agency must provide "an accurate and logical bridge" between the evidence and its decision).  But the PDUSH never explained *why* he believed that the DAB was wrong.  Absent any application *of* the applicable standard, this Court should conclude that the PDUSH did not in fact apply the standard, but instead substituted his own opinion for that of the DAB's findings.

To be sure, Congress gave the VA Secretary the authority to overturn the DAB.  But it did not make professional discipline of physicians turn on the Secretary's subjective belief about professional conduct.  Affirming the PDUSH's decision would frustrate the clear Congressional directive found in § 7462(d)(2).  *See Savu*, 2021 WL 1615562, at *6; *see generally NLRB v. Brown*, 380 U.S. 278, 291 (1965) (courts should reverse an administrative

decision that is "inconsistent with a statutory mandate or that frustrates the congressional policy underlying a statute").

Congress gave the DAB "exclusive jurisdiction" over cases (like this one) involving "a question of professional conduct or competence." 38 U.S.C. § 7462(a)(1). And with good reason: Congress wanted adverse personnel decisions concerning professional competence to be reviewed by peer professionals, not by political appointees or administrators. Congress gave the DAB the ability to act as an expert factfinding panel, authorized to receive evidence, hear live testimony, and weigh the facts with the aid of their professional expertise, just as the DAB did here. 38 U.S.C. §§ 7462, 64. Courts analyzing decisions pursuant to § 7462 have emphasized the deference owed to the DAB not only because of the statutory language, but also in light of the DAB's role as an expert factfinder. *See, e.g., Abaqueta v. United States*, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003) ("Great deference must be granted to the trier of fact who has had the opportunity to observe the demeanor of the witnesses. The [DAB] was in the best position resolve the question of the applicable standard of professional conduct.") (internal quotation and citation omitted); *Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *25 n.40 (S.D. Ga. Mar. 16, 2015) (noting that members of the DAB "as peers *and* subject matter experts, rely on their experience in the medical field to judge incidents that result in a major adverse action.") (emphasis in original). The PDUSH's decision to substitute his judgment for the DAB's violates the clear statutory mandate. The Court should reverse the PDUSH and

reinstate the DAB's original decision in Dr. Dubnow's favor or, at a minimum, remand the decision to the PDUSH to apply the "clearly contrary to the evidence" standard, as articulated in *Savu*.

## II.  THE PDUSH DISREGARDED THE STANDARD OF CARE, REQUIRING REVERSAL

Beyond the PDUSH's failure to review the DAB's findings under the correct standard, he also failed to evaluate an adverse personnel action tethered to the exercise of professional judgment through the correct lens.  Rather than relying on the standard of care, the PDUSH reversed the DAB by applying a created-for-this-case, outcome-determinative standard under which "egregiousness" of the conduct (really, the tragic outcome) was the touchstone.  Specifically, any diversion of a patient that the Emergency Department had the minimum capability and capacity to treat was unjustified, given the consequences.  (A-15.)  But this rigid rule (such as it was) was meant to rationalize an outcome:  someone had to suffer professionally for the death of the child, even when the *judgment* that led the ambulance to be diverted met the standard of care.

The PDUSH reversed only on Charge 1.  As noted above, the factual basis for this charge was that Dr. Dubnow "*inappropriately* refused care to and/or diverted a seven-month old infant in full cardiac arrest."  (A-15 (emphasis added).)  But the *propriety of* a diversion is a quintessential exercise of medical judgment.  And to know whether judgment was inappropriately exercised, the decision-maker needs evidence concerning the standard of care.  *E.g. Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009).  Exercising its

"exclusive jurisdiction" over questions of "professional conduct or competence," 38 U.S.C. § 7462(a)(1), the DAB did precisely this:  it measured Dr. Dubnow's conduct against the benchmark "community standard of care" and concluded that it passed muster.  (*See* A-28-31.)

In reversing, the PDUSH stated that "[t]he evidence shows that your decision was *not justified*."  (A-15-16 (emphasis added).)  What evidence did the PDUSH point to in evaluating the decision?  Nothing that related to the exercise of professional judgment. Instead, the PDUSH pointed to four things:  (1) "The [FHCC] not only serves Veterans but also family members housed at the military base;" (2) "the FHCC is staffed and equipped to handle pediatric cases;" (3) "the equipment necessary to handle pediatric resuscitation was available" at the FHCC; and (4) Dr. Dubnow "and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified."  (*Id.*)  In combination, the PDUSH held that these four things mean that "there was *no need* to divert the ambulance to another facility."  (*Id.* (emphasis added)).  That is, if those four things were present, professional judgment played no role in the decision whether to divert an ambulance to another facility – there was "no need," regardless of that judgment.  Specifically, professional judgment played no role, even if the Emergency Department doctors' collective medical judgment was that cardiac arrest in a seven-month-old was likely trauma-induced and that the FHCC was not the best place for that kind of patient.  Crucially, the PDUSH did not conclude that the DAB's finding that this

*was* Dr. Dubnow's professional medical judgment or that this judgment *met* the standard of care were "clearly contrary to the evidence." Instead, the PDUSH pushed aside the judgment and the standard of care, effectively concluding that in a case governed by congressionally mandated review standards specifically tailored to evaluate the propriety of the exercise of professional judgment, professional judgment would play no role at all.

Rather than defining a standard and measuring Dr. Dubnow's conduct against it, the district court and PDUSH both appear to have focused on the fact that an infant died, (A-12; A-15; A-26), a tragic occurrence, but one irrelevant to whether Dr. Dubnow's conduct met the standard of care. The PDUSH's decision was quintessential standardless decision making, and therefore plainly arbitrary and capricious.

Put another way, the PDUSH entirely failed to consider the importance of a trained emergency physician's exercise of professional judgment in light of the facts and circumstances of each case in determining the appropriateness of a decision to divert an incoming patient. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency decision is arbitrary and capricious where it "entirely fail[s] to consider an important aspect of the problem."). The PDUSH's decision arbitrarily eliminates a physician's ability to use her professional judgment regarding what is in the patient's best interest in favor of a rigid, bright line rule that minimal competence and resources take professional judgment off the table. Indeed, under the PDUSH's "rule" in this case, an emergency physician cannot divert an

incoming patient that the Emergency Department has the minimum capability and capacity to treat, regardless of the facts and circumstances of each individual case – *even when it is clear that the patient would receive better care at a different facility.*

Moreover, not only is there no support in the administrative record for the PDUSH's rule, but it also runs directly counter to the undisputed record evidence that FHCC leadership allowed Emergency Department physicians to divert ambulances to a different facility on a case-by-case basis when, in their discretion, such diversion was in the best interest of the patient.[8]  The PDUSH did not mention this evidence.

Nor did the PDUSH grapple with the following undisputed evidence:

- Due to the extremely unusual way in which the ambulance crew contacted the FHCC Emergency Department and the inability to communicate directly with the ambulance crew, Dr. Dubnow had very limited information about the patient and did not know where the ambulance was relative to the FHCC at the time of the call.  (*See supra* at 7; A-18.)

- In Dr. Dubnow's and Dr. Martin's professional judgment, the likely cause for the infant's cardiorespiratory arrest was trauma as opposed to SIDS, and therefore the patient would receive better care at a trauma center.  (A-28; 36).

- The VA made no attempt to challenge the validity of Drs. Dubnow and Martin's assumption that the infant's arrest was trauma-related.  (A-28.)   Rather, Dr.

---

[8] Specifically, the DAB found that Dr. Dubnow's decision to divert the ambulance was consistent with the FHCC Emergency Department's "established and long-standing practice of diverting [] ambulance[s] to a more appropriate facility."   (A-35-36.)   The DAB found that the FHCC Emergency Department physicians "had practiced case-by-case ambulance diversion over a substantial time frame with the full knowledge and approval of top leadership."  (A-37.)   In making these determinations, the DAB relied on the testimony of Dr. Maldonado, the FHCC's Chief Medical Executive, at least three Emergency Department physicians, the Associate Chief Nurse of the Department of Medicine, and the Nurse Manager of the Emergency Department. (A-39-40.)

Maldonado during cross-examination was asked, "[The failure to meet the standard of care] So it's not on the infant incident?" He replied, "No." (*Id.*) Accordingly, the argument that Dr. Dubnow's assessment of the etiology was incorrect or did not meet the community standard of care cannot be used to support the adverse action.

- Lake Forest Hospital, a certified Level II Trauma Center, was only a few miles away with advanced capabilities to care for pediatric patients, both during the initial resuscitative efforts and thereafter. (A-30-31.)

- Although the FHCC Emergency Department had the minimum capability (in terms of training and equipment) to assist a pediatric patient in cardiorespiratory arrest, there had *never* been a pediatric case brought there by ambulance that required advanced life support of any kind. (A-30.) The Emergency Department staff had no practical real-life experience managing an infant in cardiorespiratory arrest. (*Id.*)

- No pediatric specialists were available at the FHCC to assist with the treatment of the patient, nor to manage the patient if resuscitative efforts were successful. (*Id.*)

Based on this and other evidence, the DAB specifically concluded that "[t]he community standard of care *was met* for the patient by the decision to redirect the ambulance." (*Id.* at 32 (emphasis added).) Yet the PDUSH failed to consider any of this evidence in its cursory decision. Courts have consistently found administrative action to be arbitrary, capricious and an abuse of discretion when the administrative decisionmaker failed to consider the record as a whole and disregarded contrary evidence in the record. *See, e.g., Kastner*, 697 F.3d at 646 (ALJ relied on only one exhibit and did not consider evidence contrary to his conclusion; cursory decision was insufficient to allow for meaningful judicial review); *Barnett v. Barnhart*, 381 F. 3d 664, 668-70 (7th Cir. 2004) (ALJ ignored evidence and took a "narrow view of the record";

finding ALJ's two-sentence consideration of issue inadequate); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (ALJ's conclusion was "devoid of any analysis that would enable meaningful judicial review" and opinion failed to mention the strongest piece of evidence in favor of claimant).[9]

As this Court has observed, selective consideration of evidence on its own is a hallmark of an arbitrary and capricious decision. *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766-67, 776-77 (7th Cir. 2010) (citing cases). But it also may be an indication that bias or a conflict of interest has infiltrated the agency's decision making. *Id.* at 777. Taken together, evidence that decision-makers knew of Dr. Dubnow's whistleblower status when they should not have had that information, the AIB's cursory investigation, and the PDUSH's disregard of the standard of care support the conclusion that the decision was arbitrary, capricious, and an abuse of discretion. *Cf. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (court reviewing denial of benefits under ERISA should consider decisionmaker's conflict of interest in determining whether there was an abuse of discretion).

---

[9] Indeed, the disparity between the overwhelming evidence supporting Dr. Dubnow's decision and the total lack of evidence bolstering the PDUSH also supports reversal. 38 U.S.C. § 7462(f)(C) (Court should set aside a PDUSH decision that is "unsupported by substantial evidence"); *Kreso v. Shineski*, 67 F. Supp. 3d 1235, 1240 (D. Colo. 2014) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994) ("'Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.'")).

Because the PDUSH was required to review a termination decision grounded in the exercise of professional judgment against the standard of care, but did not, and because the only evidence in the record concerning the standard of care is that Dr. Dubnow met it, the Court should reverse the PDUSH's decision and direct the reinstatement of the DAB's decision.

C<span style="font-variant:small-caps">ONCLUSION</span>

For the foregoing reasons, the Court should reverse the district court's affirmance of the PDUSH's decision, vacate the PDUSH's decision, and remand the matter to the PDUSH with instruction to adopt the DAB's decision in Dr. Dubnow's favor. In the alternative, the Court should vacate the PDUSH's decision with instruction to reconsider the matter under the appropriate "clearly contrary to the evidence" standard and to issue an opinion that clearly articulates the basis for his decision in a manner that allows for meaningful judicial review.

Respectfully submitted,

*/s/ Jamie A. Gliksberg*
Jamie A. Gliksberg
Michael D. Frisch
CROKE FAIRCHILD
MORGAN & BERES LLC
180 North LaSalle Street
Suite 2750
Chicago, IL 60601
(312) 768-4700

Alan W. Nicgorski
HANSEN REYNOLDS LLC
150 South Wacker Drive
24th Floor
Chicago, IL 60606
(312) 265-2252

Neil Lloyd
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5500

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,814 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 12-point Palatino Linotype font (11-point footnotes).

Dated: May 24, 2021

/s/ Jamie A. Gliksberg
Jamie A. Gliksberg

*Counsel for Plaintiff-Appellant*
*Jeffrey Dubnow*

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

*/s/ Jamie A. Gliksberg*
Jamie A. Gliksberg

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the NextGen CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the NextGen CM/ECF system.

*/s/ Jamie A. Gliksberg*
Jamie A. Gliksberg

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order, Doc. 47, filed 11/12/20 ................................................ A-1

Judgment in a Civil Case, Doc. 48, filed 11/12/20 ............................................................. A-14

Letter from Dr. Steven L. Lieberman to Dr. Jeffrey Dubnow, dated 12/10/18 .............. A-15

Disciplinary Appeals Board decision, dated 9/11/18 ........................................................ A-17

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY DUBNOW, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 C 2423 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ROBERT WILKIE, Secretary of Veterans | ) | |
| Affairs, U.S. Department of Veterans | ) | |
| Affairs | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Dr. Jeffrey Dubnow, seeks review of the Final Order removing him from his federal service position as Chief of the Emergency Department at the Captain James A. Lovell Federal Health Care Center ("FHCC") in North Chicago, Illinois pursuant to 38 U.S.C. 7462(f)(1) and the Administrative Procedure Act, §§ 701–06. Dr. Dubnow claims the Department of Veterans Affairs ("VA") Principal Deputy Under Secretary of Health's ("PDUSH") reversal of the VA's Disciplinary Appeals Board's decision to overturn Dr. Dubnow's removal was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. He further argues that the PDUSH's decision was not supported by substantial evidence and the PDUSH did not follow the proper procedures in reaching his decision. For the reasons discussed below, the Court affirms the VA's decision.

**BACKGROUND**

Dr. Dubnow is a board-certified Emergency Medicine physician who has practiced since 1979. Dr. Dubnow was hired by the FHCC as the Chief of the Emergency Department in October 2011. Dr. Dubnow received positive performance reviews until his removal in April 2017. AR 101–04; 109–19, 124–35.

1

A-1

## I.    Events of April 2017

On April 29, 2017, Joseph Carney, the FHCC ED's Intermediate Care Technician ("ICT"), answered a call made by ambulance staff through the VA Police Dispatch saying that a seven-month-old baby was in cardiac arrest and was on its way in a Department of Defense ambulance. AR 2138.  Dr. Dubnow's experience was that cardiac arrest in infants usually resulted from trauma. *Id.*  Because the FHCC is not equipped to handle trauma, Dr. Dubnow told ICT Carney to direct the ambulance to Lake Forest Hospital instead.  *Id.*; AR 2143.  Dr. Dubnow later testified that he believed this to be in the interest of the patient.  AR2138.  Neither Dr. Dubnow nor ICT Carney were told that the ambulance was already on FHCC property.  *Id.*  After the phone call ended, staff realized the ambulance was already in the ambulance bay and started preparing to accept the patient and begin treatment.  *Id.*; AR 721.  However, the ambulance did not stop, and the patient died *en route* to Lake Forest Hospital.   AR 918–19, 1060, 2138.  The VA convened an Administrative Investigative Board ("AIB") to investigate.  AR 904–09.  On December 18, 2017, following the investigation, FHCC Director Dr. Stephen Holt issued the documents titled Removal and Revocation of Privileges to Dr. Dubnow.  AR 838–40, 909.

## II.    Dr. Dubnow's Appeal to the DAB

After his removal, Dr. Dubnow appealed to the Disciplinary Appeals Board ("DAB" or "the Board") under 38 U.S.C. § 7461. Dkt. 1-1 at 19; AR 2142.  On January 18, 2018 (amended February 12, 2018), the Deputy Under Secretary for Health for Operations and Management for the Department of Veterans Affairs appointed a DAB to consider the appeal.  AR 2142, 2182.  In May 2018, the DAB decided to overturn Dr. Dubnow's removal.  AR 2176.  The DAB noted procedural irregularities in the AIB's investigation that Dr. Holt relied upon, including the AIB's

2

A-2

failure to interview the EMS ambulance first responders, ICT Carney, and Dr. Martin, who was an eyewitness to the ambulance refusal. AR 2145–46. The DAB found Charge 1, "Inappropriate Refusal of Care and/or Diversion," Charge 4, "Failure to Provide Oversight," and Charge 5, "Failure to Meet Standard of Care," were also not sustained in whole or in part. AR 2151, 2161–66. The DAB also overturned Charge 2, "Failure to Follow JPI No. 11-2013-28," and Charge 3, "Failure to Follow VHA Directive 1101.05(2)," finding that Dr. Dubnow did not violate either section. AR 2154–60.

### III.     The PDUSH's Remand to the DAB and Final Decision

The Board sent its findings to Steven Lieberman, the VA's Principal Deputy Under Secretary of Health ("PDUSH"), who has the final reviewing authority within the VA. AR 2137; 38 U.S.C § 7462(d)(2)(A). The PDUSH remanded the case to the DAB, asking for further analysis as to its conclusion "that the diversion of the patient was acceptable, focusing on the fact that a fully trained, Board Certified ER physician should have been able to provide care to an infant." AR 2169. The PDUSH also sought additional analysis of the DAB's conclusion that "it was acceptable for the Appellant to assume the cardiac arrest was trauma related, and why an assessment on the patient was not warranted before reaching that conclusion." *Id.* The DAB found that Charge 1 was not sustained because the Agency did not challenge either Dr. Dubnow or Dr. Martin's assumptions regarding trauma and because the removal letter did not mention anything about a lack of hands-on analysis of the patient. AR 2172. Additionally, the DAB found that neither Dr. Dubnow nor ICT Carney were told the ambulance was already on hospital property. AR 2173. The DAB found that it did not know what portion of the JPI No. 11-2013-28 Dr. Dubnow violated, that every witness testified the ambulance never arrived and the patient was not literally turned away, and that Dr. Dubnow used his clinical judgment to re-direct the ambulance.

A-3

AR 2173. Charge 3 was also not sustained because the specification did not identify which portion of the policy Dr. Dubnow violated and because the witnesses testified the ambulance never arrived. AR 2174. Charges 4 and 5 were also not sustained. *Id.* The DAB concluded that "the Board did not sustain any of the charges by preponderant evidence. ED physicians have been given the authority to make case-by-case decisions on ambulance diversion. There was no evidence or testimony provided to show the decision to redirect the ambulance was inappropriate or a violation of any policy or directive." *Id.*

In December 2018, after receiving the DAB's additional analysis, the PDUSH rejected the DAB's decision. AR 2182–83. Pursuant to 38 U.S.C § 7462(d)(2)(A), "[i]f the Secretary finds a decision of the board to be clearly contrary to the evidence . . . the Secretary may . . . reverse the decision of the board." The PDUSH stated he did not concur with the DAB's finding regarding Charge 1, "as it is clearly contrary to the evidence." AR 2182. The PDUSH found that the FHCC

> [N]ot only serves Veterans but also family members housed at the military base. As such, the FHCC is staffed and equipped to handle pediatric cases, and equipment necessary to handle a pediatric resuscitation was available. Additionally, you and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified, and as such, there was no need to divert the ambulance to another facility. The evidence shows your decision to divert the ambulance was not justified, and created a serious situation that negatively impacted patient care.

*Id.* The PDUSH found that "the egregiousness of the conduct as described in Charge 1 justifies the penalty of removal given the circumstances of this case." AR 2183. Dr. Dubnow then sought review of the PDUSH's final decision in this Court.

## LEGAL STANDARD

Under 38 U.S.C. § 7462(f)(1), a VA employee appointed under 38 U.S.C. § 7401(1) may appeal to a district court a DAB decision:

4

A-4

> In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) obtained without procedures required by law, rule, or regulation having been followed; or
>> (C) unsupported by substantial evidence.

38 U.S.C. § 7462(f)(2). "The Court's review under this section 'directly mirrors the standards for judicial review of other administrative actions.'" *See e.g. Martin v. Dep't of Veterans Affairs*, 5:16-cv-05562, 2017 WL 3841895, *3 (S.D. W.Va. Sept. 1, 2017) (citing *Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *11 (S.D. Ga. Mar. 16, 2015) (internal citations omitted); *see also Pocha v. McDonald*, No. CV 15-475, 2016 WL 916417, at *4 (D. Minn. Mar. 10, 2016) (stating the standard under 38 U.S.C. § 7462(f)(2) "mirrors the standards for judicial review of other administrative actions, and analogous administrative law precedents are applicable").

An agency's decision is considered arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lerner v. Shinseki*, No. 3:12-CV-00565, 2013 WL 5592906, at *5 (W.D. Ky. Oct. 10, 2013) (citing *Taylor v. Principi*, 92 Fed. Appx. 274, 276–77 (6th Cir. 2004)). "The arbitrary and capricious standard is a highly deferential standard which presumes the validity of the agency's action ... Ultimately, the court's review of the administrative record is intended to inform it of the propriety of the agency's decision, not to enable the court to make its own decision...." *Martin*, 2017 WL 3841895 at *3 (citing *W. Virginia Dep't of Health & Human Res.*

*v. Sebelius*, 172 F. Supp. 3d 904, 914 (S.D. W.Va. 2016) (internal citations omitted)). Additionally, an agency's decision may be overturned if it is unsupported by substantial evidence. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966); *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment'" for that of the Secretary. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). However, if supported by substantial evidence, the decision will be upheld even if conflicting evidence exists or another outcome could be supported by the evidence. *See Consolo*, 383 U.S. at 620; *see also Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004).

## DISCUSSION

Dr. Dubnow seeks review stating that the PDUSH's review was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. He further argues that the PDUSH's decision was not supported by substantial evidence and was obtained without procedures required by law, rule, or regulation having been followed.

### I.    Arbitrary and Capricious

Under 38 U.S.C. §7462(f)(2)(A), a court should find an agency's decision is "arbitrary and capricious" if the agency relied on factors Congress did not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise. Arbitrary and capricious review is "highly deferential" and an administrative decision should be upheld "'as long as the agency's path may be reasonably discerned.'" *Sierra Club v. U.S. Environmental Protection Agency*, 774 F.3d 383, 393 (7th Cir. 2014) (citing *Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 708 (7th Cir.1999)). Review under the arbitrary and capricious standard is principally concerned with ensuring the Agency examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made, the Agency's decision was based on a consideration of the relevant factors, and the Agency made no clear error of judgment. *Id.* (citing *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004)). Dr. Dubnow seeks to relitigate the issues and urges the Court to reconsider the evidence that was properly before the DAB and PDUSH. The Court is not to re-weigh the evidence. *See Awad v. U.S. Dep't of State*, 19 C 10, 2020 WL 1182743, *4 (N.D. Ill. Mar. 12, 2020) (Kendall, J.) The PDUSH, in looking at the evidence before him and the DAB's decision, found that Dr. Dubnow's decision to divert the ambulance was unjustified as he and other staff members were capable of taking care of the patient. Dr. Dubnow does not dispute he could have cared for the infant but argues his decision was nonetheless justified. Again, whether Dr. Dubnow was justified is not for the Court to resolve. The only task is to find whether there was a rational basis for PDUSH's ruling and that there was no clear error in judgment. The PDUSH was certainly brief in his fact-finding, but in weighing the evidence before him, found Dr. Dubnow and the other FHCC staff could have and should have taken care of the patient. The PDUSH supported its decision by noting that Dr. Dubnow was trained in pediatric care and the hospital frequently cares for families. Therefore, the PDUSH determined that the DAB's decision was contrary to the evidence. Simply because the PDUSH was brief is not grounds to find his decision arbitrary or capricious. The PDUSH "need not address

every piece of evidence in the record but must 'build an accurate and logical bridge from the evidence to the conclusion.'" *Richards v. Astrue*, 370 Fed. Appx. 727, 730 (7th Cir. 2010) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). That the PDUSH reached an outcome different than the DAB does not make the decision arbitrary and capricious when supported by a rational basis.

Evidence shows that Dr. Dubnow and his staff were capable of caring for the patient, especially given that the FHCC serves not only veterans but military families. While it appears that a tragic series of miscommunications and misjudgments occurred leading the ambulance to drive away, the PDUSH's basis for its decision rests on Dr. Dubnow's initial decision to tell the ambulance they could not treat the infant when they could have and to redirect it. The PDUSH's pathway to its decision can be reasonably discerned and the Court is not to second-guess its outcome where there is a rational basis provided. *Sierra Club*, 774 F.3d at 393.

## II.    Abuse of Discretion and Not in Accordance with the Law

Dr. Dubnow claims that the PDUSH's decision was an abuse of discretion and not in accordance with the law. Dr. Dubnow's argument is premised on the PDUSH's statement that the DAB's findings as to Charge 1 were "clearly contrary to the evidence," his assessment that the decision "is clearly based on a new accusation, not contained in the FHCC's removal letter," and his belief that the PDUSH failed to consider evidence helpful to his case. (Dkt. 42 at 18–19).

Dr. Dubnow asks the Court to exceed its role by relitigating aspects of his case. Although Dr. Dubnow advances his abuse of discretion arguments extensively under separate headings, the Court's review under an abuse of discretion is the same as in arbitrary and capricious review. The scope of review is "narrow," and the Court determines only whether the agency examined "the relevant data" and articulated "a satisfactory explanation" for its decision, "including a rational

8

A-8

connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (citing *Motor Vehicle Mfrs. Assn. of U. S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The Court may not substitute its judgment for that of the agency but must confine itself to ensuring that the agency remained "within the bounds of reasoned decision making," *Id.* (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983)).

The PDUSH reviewed the evidence and articulated a satisfactory, albeit brief, reason for his decision based on undisputed evidence. Simply because the DAB provided a more fulsome reason does not render the PDUSH's decision an abuse of discretion. The parties agree evidence existed that Dr. Dubnow and other FHCC staff were equipped and capable of accommodating the patient. Dr. Dubnow testified to this himself. AR 2151, 2172. There is certainly a rational basis for the PDUSH's decision. The PDUSH has the statutory authority to review and disagree with the DAB's decision and it was not an abuse of discretion for him to do so. In fact, the PDUSH asked the DAB for additional analysis as to what he saw as the key factor here—whether Dr. Dubnow and his staff were capable of treating the patient.

Dr. Dubnow writes that the PDUSH considered a new accusation that was not considered in the FHCC's removal letter. He does not clarify what the new accusation is, nor does he cite how this constitutes an abuse of discretion. In its follow-up analysis to PDUSH, the DAB stated they did not consider a lack of hands-on analysis of the patient because it was not addressed in the initial removal letter. AR 2172. However, the PDUSH's reasoning is not based on the lack of hands-on analysis of the patient. The PDUSH justified his decision because the FHCC was capable of handling pediatric cases, it had the necessary equipment to handle a pediatric resuscitation, and Dr. Dubnow and other staff were certified in pediatric advanced life support. AR 2182. All of

these are undisputed facts. AR 2152, 2172. Simply because the PDUSH weighed the evidence differently than the DAB does not constitute an abuse of discretion.

Next, Dr. Dubnow argues that the PDUSH's decision was not in accordance with the law because he believes the PDUSH's firing was a reprisal for his whistleblowing activities. Dr. Dubnow writes, "under the Whistleblower Protection Enhancement Act, when a federal employee shows that protected activity, such as disclosing violations, was a contributing factor in an adverse action, the agency cannot thereafter prevail unless it proves that it would have taken the same adverse action by clear and convincing evidence." (Dkt. 42 at 22, citing 5 U.S.C. §2302(b)(8), (9)), First, if Dr. Dubnow would like to file a retaliation claim, he must file a whistleblower complaint with the Office of Special Counsel ("OSC"), the federal office charged with investigating allegations that an agency violated the Whistleblower Protection Act by retaliating against its employee for, as relevant here, disclosing "any violation of law, rule, or regulation." *Delgado v. Merit Systems Protection Board*, 880 F.3d 913, 915 (7th Cir. 2018) (citing 5 U.S.C. §§ 1214(a)(1)(A)). Dr. Dubnow has not, and so his retaliation claim under this statute's protections is not subject to this Court's review.

The Court notes there is simply no evidence that the PDUSH took Dr. Dubnow's whistleblower status into consideration. The DAB briefly discussed Dr. Dubnow's whistleblower status and indicated the removal demands could have come from individuals in the Navy, VISN 12, or even the VACO. AR 2148. However, contrary to Dr. Dubnow's suggestion, the DAB does not link the potential removal demands to his whistleblower status. *Id*. In fact, at the end of its decision, "[t]he DAB notes that the Appellant had been afforded Whistleblower status by the VA prior to his removal and that his status as a whistleblower had been inadvertently leaked to top leadership at FHCC. The Board was not presented with any evidence that linked his removal to

his status as a whistleblower." AR 2166. Should Dr. Dubnow wish to pursue his retaliation claim, he may file a complaint with the Special Counsel. §§ 1214(a)(1)(A).

### III.   Substantial Evidence

Dr. Dubnow next argues that the PDUSH's decision was not supported by substantial evidence. A court will not disturb an agency's decision as long as it is supported by substantial evidence—that is, if the decision is based on evidence that "a reasonable mind might accept as adequate to support the conclusion." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). A decision supported by substantial evidence "will be upheld even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Dr. Dubnow asserts without support that the "Court's review of the PDUSH's decision, must take into account that the only situation that permits the PDUSH to reverse the DAB decision is if the DAB decision is 'clearly contrary to the evidence or unlawful.'" (Dkt. 42 at 25). Dr. Dubnow arguments are largely repetitive of his prior arguments. As discussed by the Court above, the PDUSH's decision was supported by substantial, undisputed evidence that Dr. Dubnow and his staff could have treated the patient but diverted the ambulance regardless, which the PDUSH clearly found unacceptable. Therefore, the PDUSH found the DAB's decision to be clearly contrary to the evidence. Perhaps the DAB was persuaded by evidence that Dr. Dubnow was justified in his reasoning, but that is not for the Court to determine. Reasonable minds can, and clearly did, disagree over the validity of the PDUSH's decision, but the Court cannot say that it was unsupported by substantial evidence.

### IV.   Procedures Required by Law, Rule, or Regulation

Finally, Dr. Dubnow makes a convoluted and unsupported argument that the "PDUSH violated Dr. Dubnow's due process by exceeding the scope of the agency's charge…in making his

decision based on the new accusation raised for the first time in the PDUSH's decision letter that Dr. Dubnow, 'created a serious situation that negatively impacted patient care,' which is language not included anywhere in Charge 1 in this matter." (Dkt. 42 at 31–32). The "new accusation" identified by Dr. Dubnow is rooted in a semantic difference between the VA's initial removal letter and the PDUSH's ultimate removal of Dr. Dubnow. *Compare* AR 838 (charging Dr. Dubnow with having "inappropriately refused care to and/or diverted . . . [an] ambulance . . . which delayed potentially life-saving treatment") *with* AR 2182 determining Dr. Dubnow's decision to "divert the ambulance was not justified, and created a serious situation that negatively impacted patient care").

It is true that "when an agency disciplines an employee, it may do so based only on the charges in the notice of proposed action." *Do v. Dep't of Hous. & Urban Dev.*, 913 F.3d 1089, 1094 (Fed. Cir. 2019). Dr. Dubnow attempts to split hairs in order to claim that he did not receive proper notice based on the slight difference in wording. Such an argument is difficult to take seriously, which perhaps Dr. Dubnow acknowledges since the argument does not appear in his reply brief. There is a slight difference between the language of the charge letter and the PDUSH letter but the charges are identical in substance. Dr. Dubnow was charged with delaying potentially life-saving treatment. This is clearly a serious situation in that an infant died as a result. The charges were not different in any fundamental way so as to deprive Dr. Dubnow of due process.

In any event, "the due process clause is flexible and requires only 'such procedural protections as the particular situation demands.'" *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (citing *Ringquist v. Hampton*, 582 F.2d 1138, 1140 (7th Cir. 1978)). To determine whether an agency's procedures failed to meet the constitutional minimum, courts balance three factors: "'first, the private interest that was affected by the official action; second, the risk of erroneous

A-12

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Id.* (quoting *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013)). Dr. Dubnow asserts the slight change in wording deprived him of due process because the "new charge completely alters what was investigated, reviewed, and presented as evidence" but fails to specify a single alteration. (Dkt. 42 at 33). Without specifying what possible issue was not investigated or reviewed, the Court is left to speculate as to what that could be and cannot conjure any such issue based on the record. There was no due process violation.

## **CONCLUSION**

Because the PDUSH's decision to reverse the DAB and remove Dr. Dubnow was not arbitrary and capricious, an abuse of discretion, followed proper procedures, was supported by substantial evidence, and in accordance with the law, the Court affirms the VA's decision.

Virginia M. Kendall
United States District Judge

Date: November 12, 2020

13

A-13

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY DUBNOW, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 C 2423 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ROBERT WILKIE, Secretary of Veterans | ) | |
| Affairs, U.S. Department of Veterans | ) | |
| Affairs | ) | |
| | ) | |
| Defendant. | ) | |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of Plaintiff (s)

        which ☐ includes     pre–judgment interest.
        ☐ does not include pre–judgment interest.

    Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

    Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
       and against plaintiff(s)
Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: The PDUSH's decision to reverse the DAB and remove Dr. Dubnow was not arbitrary and capricious, an abuse of discretion, followed proper procedures, was supported by substantial evidence, and in accordance with the law, the Court affirms the VA's decision.

---

This action was *(check one)*:

☐ tried by a jury with Judge Virginia M. Kendall presiding, and the jury has rendered a verdict.
☐ tried by Judge Virginia M. Kendall without a jury and the above decision was reached.
☒ decided by Judge Virginia M. Kendall.

Date:  11/12/2020            Thomas G. Bruton, Clerk of Court

                             /s/Lynn Kandziora , Deputy Clerk

A-14



**Veterans Health Administration**
Washington DC 20420

DEC 10 2018

In Reply Refer To:

(051)

Jeffrey Dubnow, M.D.
8 Kingswood Court
Riverwoods, IL 60015

SUBJECT: Disciplinary Appeals Board

Dear Dr. Dubnow:

Your appeal to a Disciplinary Appeals Board (Board) regarding your removal from Federal service and revocation of privileges was received on December 28, 2017. On January 18, 2018 (amended February 12, 2018), a DAB was appointed to consider your appeal and your request for a hearing.

I have reviewed the Board's findings and conclusions as outlined in the attached Board Action, and have determined the Board's recommendation of overturning the removal action is clearly contrary to the evidence. Therefore, I have decided to uphold the penalty of removal from Federal service.

At the time of the removal, you were a full-time permanent employee who had completed your probationary period. The action being appealed is a major adverse action. At least one of the charges upon which the action was based, in whole or in part, involved an issue of professional conduct and competence, and the appeal was timely filed. Therefore, I find the Board's jurisdictional determination was proper.

The removal and revocation of privileges was based on the following reasons: **Charge 1:** Inappropriate Refusal of Care and/or Diversion; **Charge 2:** Failure to Follow FHCC JPI No. 111-2013-28; **Charge 3:** Failure to Follow VHA Directive 1101.05(2); **Charge 4:** Failure to Provide Oversight; and **Charge 5:** Failure to Meet Standard of Care. The Board did not sustain any of the charges and recommended the penalty be overturned. Upon careful consideration of the facts of the case, I do not concur with the Board's findings regarding Charge 1 as it is clearly contrary to the evidence.

The Captain James H. Lovell Federal Health Care Center (FHCC) not only serves Veterans but also family members housed at the military base. As such, the FHCC is staffed and equipped to handle pediatric cases, and equipment necessary to handle a pediatric resuscitation was available. Additionally, you and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified, and as such, there was no need to divert the ambulance to another facility. The evidence shows your decision to divert the ambulance was not justified, and created a serious situation that negatively impacted patient care.

AR_2182

A-15

Page 2.

Jeffrey Dubnow, M.D. – Disciplinary Appeals Board

     Controlling law and VA policy permits reversal of the Board decision if the decision is clearly contrary to the evidence (see 38 U.S.C. 7462; VA Handbook 5021, Part V, Chapter 1, paragraph 9(e)(1)(a)). Accordingly, I find the egregiousness of the conduct as described in Charge 1 justifies the penalty of removal given the circumstances of this case. A copy of the Board Action is enclosed. This is the final administrative action in this case.

     If you have additional questions regarding this decision, please contact Nicole Flood, OHRM Employee Relations Specialist (051), at (708) 980-3553.

               Sincerely,

               Steven L. Lieberman, M.D., MBA, FACHE
               Executive in Charge
               Office of the Under Secretary for Health

Enclosure

cc: Loretta Poston, Esq., Whistleblower Law Firm, P.A., Appellant's Representative
    Director, Captain James A. Lovell Federal Health Care Center, North Chicago, IL

| **VA** Department of Veterans Affairs | **BOARD ACTION** |
|---|---|

*INSTRUCTIONS - Prepare one copy for Field Station and one copy for Central Office for all employees for whom Board Action is forwarded to Central Office for review or filing in Board Action Folder.*

| 1. EMPLOYEE/APPLICANT'S NAME | 1A. EMPLOYEE'S POSITION |
|---|---|
| Jeffrey B. Dubnow | Physician |

| 1B. EMPLOYEE'S GRADE AND STEP | 1C. NAME OF STATION |
|---|---|
| VM-0602-Phys-04 | Captain James A. Lovell Federal Health Care Center |

## INITIATING BOARD

| 2. NAME OF BOARD *(Check one)* | 3. STATION OF BOARD | 4. DATE |
|---|---|---|
| ○ PROF. STD. BOARD  ● DISCIPLINARY  ○ PHYSICAL STANDARDS | North Chicago, IL | April 10, 2018 |

5. FINDINGS

Introduction

On February 12, 2018, a Disciplinary Appeals Board (DAB) was appointed by the Deputy Under Secretary for Health for Operations and Management for the Department of Veterans Affairs to consider the appeal filed by Jeffrey B. Dubnow, MD. Dr. Dubnow, physician received a Removal and Revocation of Privileges letter dated December 18, 2017, for Inappropriate Refusal of Care and/or Diversion, Failure to Follow FHCC JPI No. 111-2013-28, Failure to Follow VHA Directive 1101.05(2), Failure to Provide Oversight and Failure to Meet Standard of Care, from the Captain James A. Lovell Federal Health Care Center (FHCC), North Chicago, IL. Dr. Dubnow through his counsel alleges the action against him is legally insufficient because: 1. the alleged misconduct is not supported by a preponderance of the evidence in any of the charges made; 2. the removal fails to adhere to VA policy on conduct of AIBs, including tainting the AIB with conflicts of interest of investigators assigned and failure to interview critical witnesses; and 3. the removal itself has been a gross manipulation of incomplete facts to continue acts of reprisal against a physician making disclosures to better the patients and physicians at the FHCC.

Jurisdiction

Dr. Dubnow was a full-time permanent Title 38 employee at the time he received the Removal, effective December 24, 2017. A review of the Notification of Personnel Actions revealed that his employment began October 11, 2011, and he successfully completed his probationary period. Per 38 U.S.C. Section 7462, a Disciplinary Appeals Board appointed under 38 U.S.C. Section 7464 shall have exclusive jurisdiction to review any case which arises out of (or which includes) a question of professional conduct or competence of section 7401(1) employee and in which a major adverse action was taken. Per 38 U.S.C. Section 7461, a major adverse action includes any of the following: Suspension, Transfer, Reduction in Grade, Reduction in Basic Pay or Discharge. The Board found the action taken against Dr. Dubnow was a major adverse action involving professional competence or conduct. Dr. Dubnow's appeal was filed timely and there were no harmful procedural errors. The Board determined these conditions were me and the Board has jurisdiction.

Facts and Analysis:

Significant Concerns - The witness list was sent to Dr. Holt, Medical Center Director (since transferred to Dallas VAMC) by Human Resources. Agency Counsel during the hearing was using and referencing from an unredacted evidence file.

A-17

**DAB – Dr. Jeffrey Dubnow**
**Captain James A. Lovell Federal Health Care Center, North Chicago, IL**

III.  FACTS AND ANALYSIS continued:

a.   Facts Not in Dispute:

1. The ambulance squad contacted the FHCC ED in an extremely atypical method which did not permit direct contact between the ED and the EMS squad.

2. The FHCC ED cannot directly initiate radio or telephone contact with an EMS crew.

3. The FHCC ED has equipment for pediatric resuscitations and physicians and staff who are PALS certified.

3. The ED physicians and staff lacked the ability to determine where the ambulance was at any time during the communication from the EMS squad to the ED on April 29, 2017.

4. On April 29, 2017 the Appellant gave an instruction to the EMS crew transporting a 7-month-old code patient to redirect to the Lake Forest Hospital which is located a few miles away from the FHCC campus.

5. When the ambulance was seen in the ambulance bay, the Appellant and others in the FHCC ED immediately prepared to receive the patient and attempt a resuscitation of the patient.

6. The ambulance left the ambulance bay without presenting the patient to the ED and without an order to leave the facility from the Appellant.

7. An AIB was conducted in which several key participants and eyewitnesses to the events of April 29, 2017 were not interviewed.

8. The Appellant had been granted Whistleblower status by the VA.

9. The Appellant's status as a whistleblower was inadvertently disclosed to members of upper level leadership at FHCC prior to his removal.

b.   Board's Discussion of the case

        The Disciplinary Appeals Board that was convened to rule on the removal of Jeffrey Dubnow, MD from Federal Service does not sustain the removal of the Appellant.  The Board will address each individual charge, its ruling on its sustainability and how it reached that conclusion.  The Board will endeavor to elucidate its thinking during its deliberations which resulted in its conclusions.  During that accounting, the Board will delve into these subsections: the AIB and the Deciding Official's testified

DAB – J. Dubnow, M.D.                                                              page 1

A-18

reliance upon it in reaching his conclusion, the additional cases that were sent for outside review, and the two policies referenced in the removal action—VHA Directive 1101.05 and FHCC Joint Policy Instruction 111-2013-28 Diversion of Patients. Finally, this report will conclude with the DAB's recommendations.

The Board was presented with overwhelming evidence that the removal of the Appellant, Dr. Jeffrey Dubnow, was solely due to the diversion of an ambulance from the FHCC ED to Lake Forest Hospital and the subsequent death of the 7-month-old patient. Three of the five charges concern that ambulance diversion. Agency Counsel, Mr. Tim Morgan, did not attempt to build a foundation for the fourth charge, "Failure to Provide Oversight. Specification: Between November 3, 2016 and May 30, 2017, you failed to ensure your department's operations were in compliance with rules, regulations, and policies. Specifically, you failed to ensure your staff followed FHCC JPI No. 111-2013-28 and/or VHA Directive 1101.05(2)." Additionally, Mr. Morgan made no attempt to lay a foundation regarding the fifth charge, specification 1 which charged Dr. Dubnow with the failure to meet the standard of care with the treatment of Patient 4 on or about January 9, 2016. That the ambulance diversion incident was why the Appellant was removed was confirmed in Mr. Morgan's closing remarks, "Prior to the April 29th incident, obviously there was some communication regarding some problems in the ED, but the focus is on the April 29th issue before the Board. That's where your concern is." **(Morgan closing arguments, Page 847, lines 5—9)**.

The first three charges are united in that they concern only Dr. Dubnow's decision to divert the ambulance containing the pediatric patient who arrested on April 29, 2017. The second and third charges bring into the discussion the VHA and JPI policies on this diversion. Because Director Stephen Holt testified that he relied heavily on the findings of the AIB to remove Dr. Dubnow [Charge 1: "the conclusions of the AIB" **(Holt testimony, Page 386, line 14)**; Charge 2: "Based on the findings of the AIB…" **(Holt testimony, Page 387, line 9)**; Charge 3: "Again, this was sustained based on the AIB…" **(Holt testimony, Page 387, line 18)**], the Board finds it necessary to discuss the workings of the AIB and its report.

The members of the DAB thought that the distance between the FHCC and Lake Forest Hospital was a critical piece of evidence, and noted that the AIB that had been convened did not determine this information **(Dr. Edward Callahan, VISN 12 Lead for Emergency Medicine's, testimony, Page 329, lines 2—9)**. Given the importance of this information, the DAB drove between the FHCC ED ambulance bay to Lake Forest Hospital at the height of weekday afternoon rush hour traffic in less than ten minutes, despite having no familiarity of the route and relying on the iPhone maps app for directions, driving below the posted speed limit, waiting for traffic signals to turn green, and with the error of two wrong turns. The DAB believes that an EMS crew traveling with "lights and sirens" and not constrained to await on traffic signals and knowing the

correct route on Saturday afternoon, April 29, 2017 would likely have made the trip in less time.

Additionally, the Board heard testimony from Dr. Callahan that for this seven-month-old infant an, "Appropriate airway initially would be bag belt mask followed by intubation" **(Callahan testimony, page 328, lines 10—20).** Dr. Callahan also testified that, "Paramedics would certainly be able to manage an acute pediatric airway" **(Callahan testimony, page 356, lines 7—8).** The Board believes that the EMS crew was certified and competent in performing CPR and provided this code victim with effective airway support, ventilation, and oxygenation.

The DAB concludes that because a fully trained EMS crew would be expected to have a secure airway and provide effective chest compressions during transport, and because of the close proximity of the two hospitals, the time required to travel to the Lake Forest Hospital was not a critical factor in determining the outcome of the resuscitation effort.

The next area of discussion will be the AIB's failure to question witnesses who were either participants in or eyewitnesses to the ambulance diversion on April 29, 2017: the EMS squad that transported the pediatric code patient, Mr. Joe Carney, and Dr. James Martin.

In their report to the convening authority of the AIB, Dr. Praveen Mehta, Chief Medical Officer, VISN 12, the Administrative Investigative Board noted the following significant procedural issue: "With respect to the April 29, 2017 incident, the AIB was unable to interview the EMS ambulance first responders. Those DOD (Navy) employees would have been able to substantiate or refute statements provided by other witnesses. DOD was not able to authorize these EMS responders to be interviewed in time." **(Evidence File, Tab 43, Page 1).** Dr. Edward Callahan, a member of the AIB, testified to the DAB that, "We were not allowed to interview the EMS crew. I think that would have been a very critical part of the investigation." **(Callahan testimony, Page 294, lines 2—4).** He reiterated the criticality of having this testimony during subsequent testimony **(Callahan testimony, Page 383, lines 6—9).**

Director Holt clarified this issue for the Board. He stated that Captain Hawkins, the Great Lakes Naval Base Commander, "would not release that information [the patient identification, all copies of reports, the ambulance crews' names, or the transcripts from the base]. The Navy was keeping that in close hold…. I think part of their concern was that once we had the information, we would have been obligated to do an institutional disclosure with the family…they did not want an institutional disclosure to occur with the family." **(Holt testimony, Page 445, line 12—page 447, line 9).** Finally, Mr. Morgan in his closing arguments confirmed that, "DOD had

DAB – J. Dubnow, M.D.                                                                 page 3

numerous concerns regarding this case. They were concerned about PR [public relations]. They were concerned about liability. So, they weren't providing us information that was necessary to do a hundred percent evaluation and investigations regarding what's going on with the EMS employees." **(Morgan closing arguments, Page 857, lines 15—21)**.

The DAB agrees with Dr. Callahan's testimony that the EMS crew's testimony was critical, and the failure to have this testimony as part of the Evidence File used for Dr. Dubnow's removal disturbs the DAB. Only the members of that crew can answer the following pertinent questions: What was the condition of the patient when they arrived at the scene? Why was the communication to the FHCC ED atypical, going through a third-party operator rather than contacting the ED directly? Where were they located when they received the instructions through the third-party ambulance dispatcher to redirect to Lake Forest Hospital? And most important, why did they leave the FHCC ED ambulance bay rather than enter the Emergency Room? The DAB further believes that without the answers to the above questions the findings of the AIB are so significantly compromised that no individual in good conscience should rely on them to effect an adverse action.

In addition to not interviewing the EMS crew, the AIB failed to interview Mr. Joseph Carney, the Intermediate Care Technician who was working in the ED on April 29. Mr. Carney was the individual who answered the telephone call, communicated with the ambulance dispatcher, and passed on Dr. Dubnow's instruction for the ambulance to reroute to Lake Forest Hospital. Dr. Callahan testified to the DAB that, "I do believe that the Chair attempted to discover if there was a way to reach him, but they determined, because of parental leave, he was unavailable." **(Callahan testimony, Page 331, lines 16—19)**.

Mr. Carney testified to the DAB that he had approved Family Leave following the birth of his son on May 16. **(Carney testimony, Page 682, line 1)**. This leave had been approved by his supervisor, Ms. Barassi-Jackson, and was known to the HR Department **(Carney testimony, Page 683, line 21—page 684, line 23)**. Mr. Carney admitted that he was contacted by individuals at FHCC of his need to testify before the AIB, however this direction was made only in e-mail form to his work e-mail address, and the direction was made during the time that Mr. Carney was on leave. Mr. Carney further testified that he did not return to the FHCC and check his e-mail account during his ten-week paternity leave period and become aware of the direction to appear before the AIB only after the AIB had concluded their interviews. **(Carney testimony: Page 673, line 17—page 674, line 5)**.

The Board is amazed that no other method of contacting Mr. Carney was attempted given the high-profile nature of this case and the information that Mr. Carney

DAB – J. Dubnow, M.D.                                                    page 4

could have provided to the AIB.   As with the omission of testimony from the EMS crew, the DAB has grave concerns that the Evidence File lacked critical testimony, and therefore reiterates that a reasonable individual cannot rely on the AIB findings to effect an adverse action.

Another individual who was an eyewitness and participant in the events in the ED on April 29, 2017 was Dr. Martin.  He too was not interviewed by the AIB.  The AIB Chairman, Mr. Tim Campbell, determined which individuals would appear as witnesses before the Board **(Callahan testimony, Page 290, lines 20—23)**, and because Mr. Campbell did not appear before the DAB his rationale for his decision to not interview not only Dr. Martin but any other individuals who were working in the ED on April 29, 2017 is unknown.

Dr. Callahan, a member of the AIB, was asked during the DAB proceedings why Dr. Martin was not interviewed, and he responded, "I don't think that would have helped us in our decision making in our process." **(Callahan testimony, Page 306, lines 14—22)**.  However, during questions posed to him by the DAB Chairman in which it was stated that Dr. Martin was an eyewitness to the telephone call and conversations that pertained to the pediatric arrest ambulance diversion, Dr. Callahan stated, "I think that anyone in that position could potentially be beneficial [to the functioning of the AIB]." **(Callahan testimony, Page 335, lines 10—20)**.

The Board agrees with Dr. Callahan that anyone who was an eyewitness to the diversion if interviewed by the AIB would have permitted that body to function properly. The DAB appreciates that the AIB was not permitted to interview the EMS crew because of the Navy's intransience, and believed that they were unable to obtain testimony from Mr. Carney.  However, the DAB can find no rationale argument that would support their failure to interview Dr. Martin and members of the nursing staff who worked in the ED on April 29 and believes that failure to be a monumental error.  Again, it is troubling that the AIB's incomplete assessment of that day's event was the considerable evidence used by Director Holt to remove Dr. Dubnow and raises the possibility that other factors and considerations drove the adverse action.

Having completed this analysis of the AIB, the Board will now discuss whether VISN and FHCC leadership had the means to independently recognize that the AIB report lacked the meaningful testimony of Mr. Carney and Dr. Martin.

Regarding whether the FHCC leadership knew that Mr. Carney was a key witness and participant in the ambulance diversion, the Board heard testimony from Dr. Frank Maldonado that he read the transcript of the telephone call between Mr. Carney and the ambulance dispatcher.  Additionally, he testified specifically to statements that the transcript reflects were made by Mr. Carney.  **(Maldonado testimony, Page 35,**

DAB – J. Dubnow, M.D.                                                                                  page 5

line 12—page 39, line 1). Finally, Dr. Maldonado testified that, "[I read] all of them [the depositions and documents in the AIB report] regarding Dr. Dubnow, yes I did." **(Maldonado testimony, Page 108, lines 12—18)**. Dr. Maldonado's testimony indicates that he was aware of Mr. Carney's critical involvement in the diversion incident and that he was not interviewed by the AIB.

Previously, the Board discussed that Dr. Callahan was unaware that Dr. Martin was an eye-witness to the ambulance diversion. Although Dr. Callahan professed ignorance that Dr. Martin was an eyewitness to the April 29 diversion, Dr. Mehta knew this fact prior to the completion of the Evidence File against Dr. Dubnow. On October 5, after learning that the AIB was concluded, Dr. Martin e-mailed Dr. Mehta to advise him that he was concerned that despite being an eyewitness to the ambulance diversion the AIB failed to interview him. When asked if he thought that despite this omission of an eyewitness and participant in the events of April 29 the AIB could be considered as complete with an accurate representation of the events of that day, Dr. Mehta's answers were evasive and included responses such as, "When I received the email, I responded to him that the AIB was concluded....that if he has concerns that he should put it in writing and submit it to me or Dr. Maldonado," and, "Nowhere in the transcript you find [sic] Dr. Martin mentioned there." He stated, "Based on my review of the AIB, the AIB was fair." He offered that, "I basically advised him that if he has concerns, that he should put it in writing and submit it to me or Dr. Maldonado." Finally, he testified that he forwarded Dr. Martin's e-mail to Dr. Maldonado. **(Martin testimony: Page 768, line 23—page 771, line 13; Mehta testimony: Page 531, line 19—page 538, line 13; Evidence Folder, Tab 57, Exhibit 5, E-mail from Dr. Martin to Dr. Mehta, dated October 5, 2017)**.

The Board is intrigued by the following testimony from Dr. Mehta regarding the Martin e-mail: "I told [Dr. Martin] to submit his concern in writing so that I could then include that as a part of the process as far as decision making regarding the AIB. This is way after everything is completed, you know. So obviously at this point everything was already submitted with the facility. The action was already in process as far as personnel action." **(Mehta testimony, Page 539, lines 7—16)**. The Board appreciates that Dr. Mehta had already forwarded the AIB report to the FHCC Leadership, however believes that he abrogated his responsibility as both the VISN Chief Medical Officer and the Convening Authority of the AIB. On October 5 he had an AIB report that stated a major deficit in their process was the inability to interview the EMS crew. He also knew that Joe Carney, a participant in the diversion communication, was not interviewed by the AIB. And finally, he knew that Dr. Martin, an eyewitness to the event, was not interviewed. Yet despite these glaring, major omissions he felt that the AIB met his charge to perform a thorough investigation.

DAB – J. Dubnow, M.D.                                                          page 6

As concerning as it is that Dr. Mehta willingly accepted the report from an AIB that did not interview eyewitnesses and key participants, the Board draws the reader's attention to the last two sentences in his above testimony: "So obviously at this point everything is completed. The action was already in process as far as personnel action" (emphasis added). But "everything" was not completed. The DAB heard testimony that the VISN had sent out additional cases from the FHCC ED to outside reviewers, and none of the reports, at least not the ones that Dr. Maldonado used to write the Fifth Charge for Dr. Dubnow's removal, had been returned to FHCC. The Evidence File was clearly not complete, yet Dr. Mehta stated that, "The action was already in process as far as personnel action." Again, the DAB is concerned from this testimony that other factors and considerations drove the decision to fire Dr. Dubnow.

Given the sensationalistic aspect of the death of a seven-month-old DOD dependent, the Board regards the possibility that FHCC Leadership's decision to remove Dr. Dubnow may have been made within days of the diversion and prior to the convening of the AIB, with demands for removal perhaps coming from individuals in the Navy, VISN 12, and even VACO. Support for such an explosive statement is seen in the AIB testimony of Dr. Dubnow's supervisor, Dr. Nils Anderson.

During his testimony before the AIB when asked, "have you had challenges in executing your policies with Dr. Dubnow," Dr. Anderson made the following unsolicited comment, "To be completely honest, before all this started, I had put things together and I was getting ready to discipline on Dr. Dubnow for just this sort of thing as being the Section Chief, okay, which now we've pulled back because of this." **(Evidence Folder, Tab 36, Page 17, line 1—page 20, line 20)**. Dr. Anderson was asked a follow-up question on his decision to discipline Dr. Dubnow prior to the AIB and he stated that, "Well, yeah, I was getting it together and talking to HR, but we hadn't formally gone— yeah." **(Evidence Folder, Tab 36, Page 21, line 22—page 22, line 3)**.

The Board senses from his testimony, that Dr. Anderson, and perhaps others in FHCC leadership, intended for Dr. Dubnow to be removed from at a minimum his leadership position and perhaps from FHCC employment following his decision to divert the ambulance. The interested reader may wish to plod through Dr. Anderson's rambling narrative when asked, "if Dr. Dubnow has been removed from his post and Dr. Arora is temporarily filling in, what the next step would be," but the Board would offer the following briefer explanation: Dr. Anderson answered, "Dr. Dubnow is only—he's still—I mean on the books he's still the Section Chief…[statement about forming the ED as a unique department]…Dr. Dubnow—we have a new department head position and he is welcome to apply…it could be Dr. Dubnow, but we have a department head. We will have somebody else in that position. [emphasis added]" **(Evidence Folder, Tab 36, Page 30, line 13—page 32, line 13)**.

DAB – J. Dubnow, M.D.                                                                 page 7

The Board anticipated obtaining clarity from Dr. Anderson during his planned appearance before the DAB on the questions of what disciplinary/adverse action was being considered, by whom, for what reasons, and when. He had been advised that he was to appear before the DAB. However, after the DAB had convened at the FHCC and during off-the-record conversations with Agency's and Appellant's Counsel to determine the anticipated time for Dr. Anderson's testimony, Agency's Counsel informed the DAB that Dr. Anderson refused to appear. It was clarified that Dr. Anderson is no longer a Federal employee, and accordingly could not be compelled to appear before the panel.

With this backdrop of Dr. Anderson's testimony to the AIB, the Board will now examine the additional cases that were sent by VISN leadership for an outside review to glean additional insight into the processes that were occurring during the months between the diversion incident and the formal decision to remove Dr. Dubnow. Director Holt testified that the VISN made the request for additional ED cases for review and that these cases were selected by the Office of Professional Improvement at FHCC and sent to the VISN **(Holt testimony, Page 451, line 1—page 453, line 15)**. Dr. Holt stated that regarding the request for additional cases, the selection of those cases, the forwarding of the information to VISN, and the subsequent distribution of the cases for outside review, "It wasn't done through me…I found out about it purely after the fact. It was done around me…I only found out about it after the information had already flowed back to VISN." **(Holt testimony, Page 451, line 1—page 453, line 15)**.

Dr. Maldonado confirmed that, "The VISN requested several cases to be sent out for review from the emergency room…." **(Maldonado testimony, Page 72, lines 11—24)**. When asked what the process was for the selection of the cases that were forwarded to VISN, Dr. Maldonado testified that Dr. Mehta directly communicated with the FHCC Risk Department with a request for additional ED cases to be forwarded to the VISN. Dr. Maldonado believed that the Risk Department looked at, "all ePERS, the Electronic Patient Safety Reports. My understanding was that they requested any ePERS that came from the Emergency Room during that time frame." **(Maldonado testimony, Page 97, line 6—page 99, line 24)**. Dr. Maldonado also stated, "That was requested by the VISN. I think based on the AIB and—there were a lot of issues going on with the Emergency Room at the time. We had OMI come in…. In 2016 we also had the VISN come in and do a review of the Emergency Room…. So, I'm if what the VISN wanted to see is if there were any patient care issues coming in from ePERS that have been generated during that time." **(Maldonado testimony, Page 103, lines 5—16)**.

Dr. Mehta provided further insight to the Board regarding the VISN request to FHCC for additional ED cases. "So those cases came into play after the AIB was completed…. It was basically our Network Director, based on a discussion on the AIB. There were suddenly concerns that there might be additional cases out there…. So, the

DAB – J. Dubnow, M.D.                                                              page 8

QMO worked with the facility to see how they are tracking those cases to get additional information.  Once she gathered the information we reviewed it…. we reviewed the information and said, you know that a lot of these look concerning.  So, let's have the facility give us those names [of patients] and we sent it out to Lumera."  He elaborated that these additional cases, "were based on VISN level review…basically based on the review information that was selected, the cases that we identified has [sic] some concerns, we sent those out."  **(Mehta testimony, Page 571, line 12—page 573, line 17)**.  He also stated, "There were four which were identified as a concern for quality of care…. Out of the four cases with concerns, I think there were three cases that Dr. Dubnow was involved in." **(Mehta testimony, Page 561, line 12—page 562, line 1)**.  However, Dr. Mehta was unable to articulate what the rubric was that determined there were quality concerns.

The Board appreciates that prior to April 29, 2017 there were several site visits and investigations of the FHCC ED conducted by VISN and National taskforces, and heard testimony from Dr. Mehta, Director Holt, and Dr. Maldonado that they were all aware that these inspections determined that there were significant concerns regarding the FHCC ED.  What the Board cannot reconcile is why these concerns did not generate the same ePERS search when the various inspections occurred, and why the AIB wasn't charged with investigating the same time frame rather than only three specific dates.  When combined with the backdrop discussed above in Dr. Anderson's AIB testimony and the testimony from Dr. Mehta and Dr. Maldonado that VISN and FHCC Leadership were in communication regarding "personnel decisions", the DAB is disquieted that leadership searched for additional cases to support the decision to remove Dr. Dubnow.

The Board will now discuss the charges.

<u>Charge 1</u>

The first charge in this case reads, "<u>Inappropriate Refusal of Care and/or Diversion.  Specification:  On or about April 29, 2017, at approximately 2:01 p.m., you inappropriately refused care to and/or diverted a seven-month old infant in full cardiac arrest en route via ambulance to the FHCC Emergency Department (ED) to Lake Forest Hospital which delayed potentially life-saving treatment.  The infant was pronounced dead at 2:46 p.m. at Lake Forest Hospital.</u>

Findings as to Charge 1, The Board concludes that this charge is **not sustained in whole or in part** (by a 2-1 vote).

Dr. Dubnow testified that on April 29 he was in a setting which had the necessary equipment and PALS certified staff to accommodate a pediatric code. **(Dubnow testimony, Page 133, lines 3—6; Tab 40, page 7, line 13ff)**.  The AIB also indicated

that a statement of fact was that, "All [FHCC] ED providers are board certified physicians who are capable of treating patients…including pediatric under cardiac arrest." **(Evidence Folder, Tab 43)**. Having heard nothing to the contrary from other witnesses nor seeing anything to the contrary in the Evidence File, the Board concludes that the FHCC ED had the capacity to manage a pediatric arrest. Therefore, the Board does not believe that a lack of capacity to manage a pediatric code was the reason Dr. Dubnow diverted the ambulance. Instead, the Board believes that based upon his clinical experience and the limited information that was presented by the ambulance dispatcher, Dr. Dubnow did not consider that the FHCC ED was the most appropriate facility to treat the patient when compared to Lake Forest Hospital, and that it was this belief that caused him to issue the instruction to divert the ambulance.

One might question why it would be appropriate for a physician to divert a patient en route in an ambulance without knowing additional information regarding the patient's status. Indeed, Agency's Counsel constructed the argument that the Appellant should have obtained this additional information. The DAB offers the following points.

First, the call between the ambulance crew and the FHCC ED was not conducive to such a back-and-forth dialogue in real time. The flow of information was constrained and confused because it had to be relayed by a third party **(Maldonado testimony, Page 82, lines 1-2; Carney testimony, Page 633, line 23—Page, 634, line 9; Page 636, line 15—Page 638, line 15; Page 662, line 10—Page 663, line 3; Martin testimony, Page 763, lines 7—15; Page 767, lines 14—24; )** This type of communication is also error-prone, and the reader must remember that the limited information—the patient was a seven-month infant in cardiac arrest—was enough for Dr. Dubnow to conclude that the FHCC ED was not the best place for this child to be treated. During the time required to obtain additional information such as the condition of the child upon arrival of the EMS crew, the length of time CPR had been performed, the precise location of the arrest site, and the effectiveness of the CPR efforts, the ambulance would continue to approach the FHCC rather than travel to the Lake Forest Hospital, a center a few minutes away which the Appellant believed superiorly capable to care for a pediatric patient. The reader is reminded that at no time did the Appellant know the precise location of the ambulance including when it entered the FHCC campus, and that his intent, as will be demonstrated below, was for the ambulance to transport the baby to the best facility as quickly as possible.

Additionally, the Proposing and Deciding Officials did not state in their charges that the removal was because Dr. Dubnow did not solicit additional information prior to redirecting the ambulance. The Board recognizes that some physicians might have sought additional information prior to redirecting the ambulance, however Dr. Dubnow's failure to solicit additional information was not a deviation from appropriate medical care. Lastly, there was no information that could be provided that would change the dynamics of which of the two hospitals was the best location for the child to be brought to. Indeed, any attempt to solicit additional information would be a distraction to the

crew attempting to revive the child and would not alter Dr. Dubnow's conviction as to which hospital was the best to care for the infant.

The Appellant based his decision on his belief that the infant had arrested secondary to trauma and not SIDS. The Board acknowledges that a robust discussion on the etiologies of pediatric arrests is beyond its charge. The Board heard testimony from two PALS certified, Boarded Emergency Medicine physicians, Dr. Dubnow and Dr. Martin, that the most likely etiology for this infant arrest was trauma **(Dubnow testimony, Page 161, lines 7—15; Martin testimony, Page 765, lines 14—19; Page 767, lines 6—13; Page 782, line 4;).** The Agency made no attempt to challenge the validity of this assumption and the Board also notes that Dr. Maldonado did not base his recommendation for removal on whether Dr. Dubnow's assumption of the likely etiology was incorrect. Rather, Dr. Maldonado during cross-examination by Appellant's Counsel was asked, "[The failure to meet the standard of care] So it's not on the infant incident?" He replied, "No." **(Maldonado testimony, Page 122, line 21—page 123, line 17).** Accordingly, the argument that Dr. Dubnow's assessment of the etiology was incorrect or did not meet the community standard of care cannot be used to support the adverse action.

The Board recognizes that Director Holt views this case of ambulance diversion as clear-cut and wrong. He passionately testified, "We have all the equipment. We have the nursing staff trained to do this. We had the room available. Help me here. I don't understand how we're not capable of doing pediatric emergencies. Now, pediatric major bleeding out trauma, that's different, but airway control and the management of cardiac rhythm?" **(Holt testimony, Page 376, lines 16—22).** Additional evidence that Director Holt felt that the issue was clear-cut is apparent by his answers to two questions. When questioned about possible bias of the members of the AIB, he asserted, "I can't gauge to what degree that influenced them. What I can do though, is look at the facts independent of opinion, facts like all the nursing staff were trained, all the physicians were trained, we had the equipment, we had the room available, we weren't on divert. That's the things I could look at and say, okay, this is in contrast to this policy and this policy." **(Holt testimony, Page 460, line 19—page 461, line 20).** And when questioned about the incompleteness of the AIB investigation he responded, "I felt that the facts of the case were complete without that information, yes." **(Holt testimony, Page 467, lines 13—16).**

Regarding his belief that Dr. Dubnow's decision was wrong, he stated, "Well, first let me say the AIB concluded it was wrong. In my making decisions about this as the deciding official, I did not apply my physician knowledge to this. I applied straight what was in the evidence folder and what was provided to me by the Counsel. Now if you're asking me as a physician unrelated to the decisions in this case, I would say it was a bad call. And I'll qualify that as a physician who's also been the chief physician for an ER." **(Holt testimony, Page 391, line 24—page 392, line 21).**

DAB – J. Dubnow, M.D.                                                                 page 11

Both Dr. Maldonado and Director Holt made statements that reflected their beliefs that no physician would make the decision that Dr. Dubnow did. Unfortunately, there is no mechanism available where practicing ED physicians could be surveyed on this issue. Even the opinions of expert physicians in a court-room setting are not definitive; experts can be found to support both sides of any issue.

Although the Board did not hear the opinion of any expert physicians proffered by either the Agency or Appellant Counsels, the Board did hear testimony from Dr. Dubnow and Dr. Martin. The testimonies of these physicians were that a pediatric or infant cardiac arrest has never been treated at the FHCC ED. Dr. Martin also testified, "In this particular case, given the information that I had, the best place was a trauma center;" this opinion was confirmed even with the knowledge that the scene of the arrest was Base Housing **(Martin testimony, Page 766, lines 7—13; Page 766, line 19— page 767, line 13)**.

Dr. Dubnow admitted that although the FHCC had equipment and staff that could manage a pediatric arrest, he acknowledged that the equipment and staff were not battle-tested. **(Dubnow testimony, Page 134, lines 7—12; 157, lines 19—22; Page Tab 40, page 9, lines 3—6)**. Indeed, in response to a statement that Mr. Morgan made Dr. Dubnow responded, "You made a statement a moment ago this is a very advanced pediatric ER. That's not a true statement, sir." **(Dubnow testimony, Page 145, lines 3—5)**. He stated that he had no comfort with the capabilities of the respiratory therapy department to manage the ventilator settings for an infant. He expounded, "I doubt that they [respiratory therapists] have ever had any experience doing that at this facility….in regard to managing ventilator settings on a 7-month old, no. And there's no pulmonologist, here who could do it. There's no pediatrician who's coming in. There's no critical care doctor." **(Dubnow testimony, Page 178, lines 3—18)**.

In addition to lacking an ED staff that had ever treated a pediatric arrest patient, Dr. Dubnow knew that he did not have a pediatrician on staff that could assist in the management of the code, nor manage the child if the resuscitative efforts were successful. He testified that, "It's beyond the realm writing ventilator orders for a 7-month-old by an ED doc in a place like this [FHCC]. We've never seen that kind of patient before." **(Dubnow testimony, Page 191, lines 15—18)**. The importance of that last deficiency cannot be overstated. If the resuscitation were successful the child would have to be cared for in the ED by Dr. Dubnow until the infant was transferred to another hospital **(Dubnow testimony, Page 177, lines 2-11)**. An accepting physician at a facility that had an available Pediatric Intensive Care Unit bed would have to be found. Then, appropriate transport would have to be arranged. This would take time, perhaps hours, and during that time the patient's condition would be precarious and would not be managed by a pediatric intensivist or even a pediatrician. The Board believes that management of an intubated seven-month old in an Emergency Room by only an ED physician who did not have recourse to a pediatric intensivist or even a

A-29

pediatrician for the management of the patient would be a deviation from the community standard of care.

The Board also heard testimony from witnesses that the FHCC equipment and staff were not battle-tested for the management of a pediatric code. Indeed, the Board learned that the closest incident to the treatment of a seven-month-old arrest victim during the preceding five to six years was the sole case of an intubation that had been performed on a fifteen-year-old asthmatic. **(Barassi-Jackson testimony, Page 215, lines 6—12)**. Additionally, Mr. Carney testified that during his over five years of employment in the FHCC ED that, "there's never been a pediatric case brought by ambulance that required advanced life support of any kind," and that based upon the experience they would have at the FHCC ED, the staff did not have, "practical real-life experience with providing PALS to a live patient." **(Carney testimony, Page 644, line 6—page 645, line 3; page 645, lines 4—10)**.

Besides knowing that the FHCC had never treated a pediatric arrest let alone a 7-month-old cardiac arrest during his tenure there, Dr. Dubnow knew that, "The capabilities of the hospital [Lake Forest] far exceed the capabilities at FHCC." **(Dubnow testimony, Page 159, line 22—page 161, line 18)**. Additionally, in a letter he authored to the OIG and which was included in the packet of information that was provided to Director Holt, Dr. Dubnow wrote that the Lake Forest Hospital is only a few minutes away from the FHCC facility and that the Lake Forest Hospital is the nearest hospital with advanced pediatric capabilities to care for a pediatric patient. **(Evidence Folder, Tab 47, Exhibit 7, Page 148, lines 6—14)**. Last, Dr. Dubnow testified that, "My decision as to where that patient should best be cared for was the decision to be cared for at Lake Forest Hospital. With the information I had at the moment, I deemed that in the best interest of that patient at that time with the information that I had." **(Dubnow testimony, Page 143, lines 3—8)**.

The Board believed that Dr. Dubnow was confident in his ability to manage a pediatric code, but knew that the VA was not the best place for this code to be conducted. He also knew that Lake Forest Hospital, located in the immediate vicinity to the VA, did have the resources and therefore believed it to be the best option for this patient. The DAB concurs with that assessment. The community standard of care was met for this patient by the decision to redirect the ambulance.

Earlier in this report, the reader was provided testimony from Dr. Holt that stated that the AIB concluded that Dr. Dubnow's decision to divert the ambulance was wrong **(Holt testimony, Page 391, line 24—page 392, line 21)**. The Board reviewed the opinion report of the AIB which was composed of two ED physicians, Dr. Callahan and Dr. Frank Dos Santos **(Evidence Folder, Tab 43)**. The AIB did not make a statement that Dr. Dubnow's decision to divert the ambulance was "wrong". This fact is in direct contradiction to Director Holt's statement that the AIB said the diversion was wrong.

DAB – J. Dubnow, M.D.

A-30

The Board further disagrees with Director Holt that the decision-making in this case was clear-cut. Nor does it believe that Dr. Dubnow "inappropriately" diverted the ambulance. Instead, it believes that this case is one where a physician assessed a rare occurrence in the United States and a never-before-treated occurrence at FHCC, that was presented with incomplete information delivered by stressed individuals in a highly irregular manner, and that the physician subsequently acted immediately with the best interests of the patient in mind. Yes, he was PALS trained. Yes, the ED nursing staff had PALS training and competencies to care for pediatric patient. Yes, the ED had equipment that would be used during a pediatric code. However, and most important, the Appellant knew that the VA's staff had NEVER been tested caring for a coding pediatric patient, let alone one that was a seven-month-old infant. Mannequin resuscitation is useful as a training exercise, but doesn't include the emotions and stresses of performing the same maneuvers for the first time on an actual baby. Successful mannequin resuscitation can never predict successful resuscitation of a patient.

Unfortunately, the patient was unable to be rescued at Lake Forest Hospital, but that is hardly proof that Dr. Dubnow made a decision that deviated from the community-standard of care. Good and proper medical decisions sometimes end with bad results.

The last potential question that a reader might have that will be addressed by the DAB is, why didn't the Appellant contact the ambulance after he became aware that it left the ambulance bay. The Board heard testimony that the ED lacked the ability to contact any ambulance directly **(Dubnow testimony, Page 174, lines 3—12; Carney testimony, Page 641, lines 6—20; Martin testimony, Page 791, lines 12—16).** It was impossible to call them.

<u>Charges 2 and 3</u>

Charge 2:  Failure to Follow FHCC JPI No. 111-2013-28.  Specification:  On or about April 29, 2017, at approximately 2:01 pm, you inappropriately refused care to and/or diverted a seven-month old infant in full cardiac arrest en route via ambulance to the FHCC ED in violation of FHCC JPI No. 111-2013-28, Diversion of Patients, as diversion had not been officially declared.

Charge 3:  Failure to Follow VHA Directive 1101.05(2).  Specification:  On or about April 29, 2017, at approximately 2:01 pm, you inappropriately refused care to and/or diverted a seven-month old infant in full cardiac arrest en route via ambulance to the FHCC ED in violation of VHA Directive 1101.05(2), Emergency Medicine, as the criteria for diversion had not been met.

Charges 2 and 3 both deal with the case of the ambulance diversion and are united that they reference a deviation from policy, therefore a discussion follows addressing both charges collectively with a separate discussion afterwards discussing

DAB – J. Dubnow, M.D.                                                                                    page 14

them individually.  The two policies that are referenced are VHA Directive 1101.05(2) **(Evidence Folder, Tab 20)** and FHCC JPI No. 111-2013-28 **(Evidence Folder, Tab 2)**.

VHA Directive 1101.05(2) was signed on September 2, 2016, amended on March 7, 2017, and with Appendices is sixty-six pages long.  The Board accepts that this directive served as national VHA policy while Dr. Dubnow was employed at the FHCC ED and that it provides instruction regarding diversion.  When Director Holt was asked to provide the specific policy violations in his sustainment of Charges 2 and 3 he stated, "I believe you'll find the answers to those questions specified in the AIB…. The AIB cited the exact areas that I cross-referenced to confirm.  But I believe if you go to the AIB, you'll find the exact areas that they're referencing in the charges." **(Holt testimony, Page 409, line 19—page 411, line 18)**.  Accordingly, the Board will now explore the AIB report **(Evidence Folder, Tab 43)** with respect to these policies and the "exact areas" that reference deviation from policy.  The AIB listed the following items in the section titled, "Findings of Fact":

"The following National Directives and Facility policies apply to the diversion and the processes of all Department of Veterans Affairs Emergency Rooms and apply to all cases reviewed by this AIB:

a) VHA Directive 1101.05 Revision date September 2, 2016, Section 9 General Operations Requirements.  1st Paragraph (reference to EMTALA).
b) VHA Directive 1101.05 Revision date September 2, 2016, Section 9e. Diversion.
c) VISN 12 Policy Memorandum 10N12-05-15R2 Diversion Policy.
d) FHCC Joint Policy Instruction 111-2013-28 Diversion of Patients Section 2 A (8) Revision date October 24, 2013. (Patient Demand Definition).
e) FHCC Joint Policy Instruction 111-2013-28 Diversion of Patients Section 2 A (9) Revision date October 24, 2013. (Diversion Definition).
f) FHCC Joint Policy Instruction 111-2013-28 Diversion of Patients Section 3d Revision date October 24, 2013. (Diversion procedure/notification)."

Additionally, with respect to the April 29, 2017 case, the AIB stated that, "it is substantiated that there was a violation of VHA Directive 1101.05, VISN 12 Policy Memorandum 10N12-05-15R2 Diversion Policy and FHCC Joint Policy Instruction 111-2013-28 Diversion of Patients." **(Evidence File, Tab 43, pages 2 and 5)**.

The language of the paragraph referenced in item "a)" above is contained in VHA Directive 1101.05 **(Evidence Folder, Tab 20)**, and can be summarized that the facility is required to have "an organizational plan that is consistent with medical facility bylaws and is guided by national and local practice guidelines, policies, and procedures necessary for efficient and safe emergency care."  It further references that a medical

DAB – J. Dubnow, M.D.                                                                 page 15

A-32

screening exam must be performed on each patient that enters a VA and is seeking medical care. Finally, it specifies that even though EMTALA does not legally bind a VA medical center, that the VA's medical centers will comply with EMTALA. **(Evidence File, Tab 20, Page 22)**.

The Board heard no testimony of how Dr. Dubnow violated this portion of the sixty-six-page policy. Every witness that testified to the DAB confirmed that the pediatric patient was never presented to the ED. Further, the testimonies of Carney and Dubnow indicate that once it was recognized that the ambulance was in the bay, Dr. Dubnow and the rest of the ED staff immediately prepared to manage the pediatric arrest **(Carney testimony, Page 639, lines 3—22; Dubnow testimony, Page 156, line 1—page 157, line 7)**.

Item "b)" above is reproduced for the reader's convenience **(Evidence File, Tab 20, Page 23)**:

"**Diversion.** It is recognized that circumstances may dictate the need to go on diversion status from time to time in the ED. A diversion policy needs to be in force that provides clear indications for the use of diversion and limitations for the length of time spent on diversion without a re-evaluation of the situation. Local EMS policies and agreements may dictate some of the parameters for ED and medical facility diversion status. A VA patient being transported by ambulance has the right to request to go to a VA ED unless the assessment by certified EMS provider (in direct radio or telephone contact with the VA ED provider) indicates that complying with the patient's request could result in further harm to the patient from delay in obtaining appropriate treatment, or the facility is on Internal Disaster; for example, trauma patients should go to the nearest trauma center in the area designated by local EMS protocol."

As with section "a)" the Board fails to see how this section of the VHA Directive was violated by Dr. Dubnow. The directive requires a local policy on diversion, and the Board believes that the local policy in effect was JPI 111-2013-28. The Board will discuss this JPI below, but the stated deficiency of failure to have a policy that addresses diversion is false.

Item "c)" was not part of the Evidence File and the Board draws no conclusion regarding its content. However, because it was not contained in the Evidence File that supported Dr. Dubnow's removal the Board concludes that the Recommending Authority, Dr. Maldonado, the HR staff that created the Evidence File and assisted Dr. Maldonado with the writing of the Proposed Removal, and the Deciding Official, Director Holt, did not believe that this VISN Policy Memorandum applied in the case of Dr. Dubnow's removal.

<u>Charge 2</u>

DAB – J. Dubnow, M.D.                                                                                           page 16

Having completed its discussion regarding the items labelled "a) thru c)" in the AIB's report under the section "Findings of Fact", the DAB will now discuss items "d) thru f)". These items are all contained in FHCC JPI No. 111-2013-28 **(Evidence Folder, Tab 2)**.

The Board recognizes that the Captain James A. Lovell Federal Health Care Center is unique in the VA system, and believes that JPI 111-2013-28 is the eight-page document that governs the center's approach to the diversion of patients. The AIB concluded under their "Findings of Facts" section that the specific violations of this Joint Policy Instruction were: Section 2 A (8) Patient Demand Definition, Section 2 A (9) Diversion Definition and, Section 3d. As the reader might surmise Section 2 concerns itself with definitions; Section 3 Is titled "Procedures".

AIB Finding of Fact "d)" concerns the definition of "Patient Demand" and is essentially a cut-and-paste paragraph from VHA Directive 1101.05(2). Section 2 A (8) reads, "A VA patient who, is being transported by ambulance, requests to go to a VA ED." The definition continues that this patient demand must be honored unless one of two conditions exists. The first condition is an internal disaster diversion. The reader may note that the second condition has identical language of VHA Directive 1101.05(2): "An assessment by a certified EMS provider in direct radio or telephone contact with the VA ED provider indicates that complying with the patient's request could result in further harm to the patient from delay in obtaining appropriate treatment. For example, a trauma patient must go to the nearest trauma center in the area designated by local EMS protocol."

The DAB does not see how Dr. Dubnow violated this section of the directive which is identical in content to the VHA Directive discussed above. The reader can apply the same argument that the DAB used for that Directive analysis for this analysis of "d)".

The deviation claimed in item "e)" is more complicated to analyze and the discussion will follow the Board's analysis of item "f)".

Item "f)" regards the requirement for the ED staff or the Medical Facility Bed Coordinator or Nursing Supervisor to notify the Chief Medical Executive when an "Alert Status" is being considered. Although not directly referenced by the AIB as being a deviation, the DAB will exercise some license by noting that "Alert Status" is defined in Section 3c, the immediate predecessor to the section in question, and will consider that the AIB's failure to reference that is a simple and unintended error. Alert Status can be declared if there is but one available ICU bed, or one acute care available bed, or but one acute psychiatric care bed available. Section 3d, was that referenced by the AIB as applying to the cases they investigated, and details the actions that the various clinical

department leaders will take if an Alert Status is declared. These six steps include items such as cancelling elective surgery and discharging stable inpatients. None of the six steps delineate ED responsibilities, and accordingly, the section will not be reproduced. The Board does not see any evidence how this section of the JPI was violated by Dr. Dubnow.

The DAB will now discuss item "e)" the section of the JPI that provides the definition of diversion and is the following:

"**Diversion**. The situation where any or all patients arriving by ambulance or referred from an outside VA or non-VA facility (who would normally be treated by the receiving facility) cannot be accepted because appropriate care, services, or beds are not available, staffing is inadequate or a disaster has disrupted normal operations. In this situation, patients are diverted to another facility for care and treatment."

The Board believes that the two issues that need to be addressed in the analysis of this claimed deviation from policy are "patients who would normally be treated by the [FHCC]," and "because appropriate care, services, or beds are not available." Certainly, in the broad sense pediatric patients are treated at the FHCC and the center has the capability of treating patients who have experienced an arrest. The DAB also appreciates from numerous individuals' testimonies that there are several subtypes of patients that are not normally treated at FHCC. The Board was not presented with any policy, directive, SOP, or memorandum of understanding that could be construed to be a list of these subsegments of patients that would not be normally treated at the FHCC ED. The Board further notes that the AIB was unable to discover these documents as well. In his testimony to the AIB, Dr. Anderson indicated that there are not any SOP's or written list to clarify when the ED physicians can instruct an ambulance not to present to the ED. "Not that I know of. They may have it down in the ED. But to be honest I would have to look into it. I mean that's a good point. That's one of the things we are trying to get around to, but, yeah." **(Evidence Folder, Tab 36, Page 27, lines 9—17)**.

The Board will now address what it sees as the key issue for this deviation from policy as referenced by the AIB: The permission for ED physicians to divert ambulances from the facility because the "appropriate care is not available". The FHCC ED as discussed at length earlier in this report had the necessary equipment and PALS-certified staff and physicians to manage a pediatric arrest. Thus, from this interpretation the FHCC ED could provide appropriate care, and therefore, the diversion of the ambulance with the pediatric arrest patient was not permissible.

Balancing this argument is Dr. Dubnow's conviction that the patient was likely a trauma victim, and accordingly the FHCC ED was not capable of providing appropriate care. He therefore used his clinical judgment which is permitted by policy and followed

DAB – J. Dubnow, M.D.                                                                    page 18

A-35

the established and long-standing practice of diverting the ambulance to a more appropriate facility. Thus, from this interpretation Dr. Dubnow's decision was not only medically sound, but also permissible by the Directive.

Additionally, although the ED had the equipment and staff to manage a pediatric arrest, the Board has provided evidence to the reader that the equipment had never been used by staff and ED physicians on a pediatric patient in at least six years, that the FHCC has never had a patient requiring ALS brought to it by ambulance, and that the center lacked a pediatrician, a pediatric intensivist, and a pediatric intensive care unit. Given this insight regarding the absence of even a pediatrician, Dr. Dubnow's decision was again medically sound and permissible by the Directive. FHCC could not provide appropriate care.

The Board concludes that this segment of the alleged violated directive is dependent upon a judgment call, and believes that Dr. Dubnow's assessment that Lake Forest Hospital was better equipped to manage a pediatric arrest was reasonable.

The reader may complain that the AIB's report in which the specific sections of the policy that applied during their review is a technical error, and that the entire JPI Directive on Diversion must be analyzed. The Board acknowledges that complaint but will draw the reader's attention to Director Holt's comments: "I believe you'll find the answers to those questions specified in the AIB…. The AIB cited the <u>exact</u> areas that I cross-referenced to confirm. But I believe if you go to the AIB, you'll find the <u>exact</u> areas that they're referencing in the charges." (emphasis added) **(Holt testimony, Page 409, line 19—page 411, line 18)**. When Director Holt was asked why he didn't cite in his decision to remove the Appellant the appropriate or pertinent part of the AIB, he answered, "I'm not required to." **(Holt testimony, Page 412, line 23—page 413, line 2)**. The Director was very clear that the AIB report contained the appropriate specific areas of policy violation.

Director Holt stated that he didn't have to cite the specific policy areas of deviation that warranted removal and this DAB certainly does not have the charge to guess at any other potential area of the JPI or VHA directive that Dr. Dubnow may have violated. The DAB also does not have the charge to or responsibility for conducting a new investigation. However, the Board does feel that it is important to address the JPI language regarding patients arriving by ambulance and patients requiring Advanced Life Support, and accordingly will augment their responsibility.

Under Section 3a in JPI 111-2013-28 there is a single line: "ED must never turn away an ambulatory patient or a patient that has arrived by ambulance." **(Evidence File, Tab 2, page 2)**. Brief in its simplicity this requirement is easy to apply to the case of the pediatric diversion. The patient never arrived in the ED. The EMS crew left the

DAB – J. Dubnow, M.D. page 19

A-36

ambulance bay while Dr. Dubnow and others were preparing to care for the baby. The Board concludes that Dr. Dubnow did not deviate from that portion of the JPI.

Section 3f deals with the diversion of patients that require advanced life support. This section delineates when the ED can be placed on ALS Diversion, and for the sake of brevity the Board acknowledges that none of those conditions applied and/or the ED was on ALS Diversion at the time that the ambulance call was received **(Evidence File, Tab 2, pages 3)**. The Board notes that the JPI is silent on whether an ED physician can advise an ambulance with a patient who is in a life-or-death emergent situation to divert to a facility a few minutes away from the FHCC, if that physician believes it is in the best interest of the patient because the center lacks the personnel and resources to provide care. Although one may agree with the Board that the JPI represents a poor attempt to shoe-horn in through cut-and-paste technique portions of a sixty-six-page VHA directive, it is that policy which was in place on April 29, governing the FHCC ED. This section of the policy also states that even if the ED is on an official diversion status, that, "the ED can still receive ambulances if...the patient has an acute, life threatening emergency such as an unmanageable airway, is being given CPR, or has uncontrollable hemorrhage, and FHCC is the closest facility." **(Evidence File, Tab 2, Page 4)**. "Can" not "must."

It is based upon this language of the policy <u>alone</u>, and not on the distances between facilities, or the location of base housing, or the inappropriate method of communication to the ED, or the failure to ask for additional information, or the location of the ambulance when the direction to divert was made, or the demonstrated real-life competencies of the FHCC ED staff to manage a pediatric code, or the opinions of any ED physician or professed expert in the field, or the failure of the AIB to conduct a complete investigation—all areas that the Board heard ample testimony about—that this DAB will now rule.

The Board **does not sustain** not only that Dr. Dubnow did not violate the specific sections of the JPI that Director Holt indicated that he cross-walked from the AIB report to sustain the Appellant's removal, but more importantly, that he did not violate JPI 111-2013-28. The policy does not prohibit case-by-case ambulance diversion, even for patients in an arrest. Additionally, as will be discussed in Charge 4 below, the FHCC ED physicians had practiced case-by-case ambulance diversion over a substantial time frame with the full knowledge and approval of top leadership.

Findings as to Charge 2, The Board concludes that this charge is **<u>not sustained in whole or in part</u>** (by a 2-1 vote).

<u>Charge 3</u>

DAB – J. Dubnow, M.D.                                                                 page 20

Findings as to Charge 3, The Board concludes that this charge is **not sustained in whole or in part** (by a 2-1 vote).

Charge 4

"Charge 4: Failure to provide oversight. Specification: Between November 3, 2016 an and May 30, 2017, you failed to ensure your department's operations were in compliance with rules, regulations, and policies. Specifically, you failed to ensure your staff followed FHCC JPI No. 111-2013-28 and/or VHA Directive 1101.05(2).

Findings as to Charge 4, The Board concludes that this charge is **not sustained in whole or in part** (by a 3-0 vote).

The Board recognizes that the AIB concluded that the physicians in the FHCC ED were non-compliant with the policies governing diversion. However, the Board is unclear what evidence the AIB used to reach this conclusion. It appears that the evidence which was used was the substantial and consistent testimony that it heard from a variety of witnesses which confirmed that case-by-case ambulance diversions occurred. However, the Board noted above that both Directives are silent on the topic of case-by-case ambulance diversion by ED physicians. This silence was also appreciated by the AIB during the testimony of James Miller, Associate Chief Nurse of the Department of Medicine as evidenced by the following exchange between Dr. Callahan and Mr. Miller **(Evidence File Tab 33, pages 7--8)**:

> Dr. Callahan: "Now, it's not in the policy that we could find, but the practice of individually diverting patients, so one by one, are you aware of that in a policy somewhere or is that just a local practice?"

> Mr. Miller: "I know some of the local rescue squads, they are part of Region 10….Region 10 allows a squad to bypass a facility if they are going to a facility where more appropriate care can be given. They often use ST elevation MI as an example where if they are coming to somewhere like here that does not have a Cath lab, they can bypass us to go to someplace that does have a Cath lab. And I believe the only…the only caveat to that is if there is an unstable, unmanageable airway, then they can stop at the closest facility."

> Mr. Campbell: Q. "So, for further clarification, from the facility's perspective, the providers within the Emergency department, is there any type of internal policy that dictates when they divert on a case-by-case basis?"

> Mr. Miller: "The policy that we have allows the physician in the Emergency department to divert an ambulance if one of the previous conditions exist, you know, like I explained about no beds for Med Surg, no beds for ICU, no beds for psychiatry. The only way that they can divert them from the ED is if there are no

DAB – J. Dubnow, M.D.                                                                    page 21

A-38

monitored beds in the ED.  On an individual basis, if there are beds available in the ED and a physician chooses to divert, I don't know that that's covered in the diversion policy…."

Dr. Callahan: "Yeah, we couldn't—we could not find that in the written policy. That's why we were wondering if there was some other secondary policy or something that's… [Mr. Campbell interrupts], "Some unit level SOP or something that says that."

Mr. Miller: "I don't believe there is a unit level SOP, but Chris Barassi-Jackson would be the person, if she has developed one, would have that information for you."

The following exchange between the members of the AIB Board and the Nurse Manager of the ED, Ms. Chris Barassi-Jackson further supports that although the referenced policies are silent on case-by-case ambulance diversion, that the practice occurred and was approved by upper level leadership of the FHCC **(Evidence folder Tab 34, pages 8—9)**:

Ms. Barassi-Jackson: "Single case divert…. So, if a call comes in and it sounds like perhaps it exceeds our capabilities or you know, depending on what's going on inside the ER itself, leadership has told the doctors that they could make a case-by-case decision whether or not they felt it was in the best interest of that patient to go directly elsewhere."

Dr. Dos Santos: Q. "Who is leadership in that case?"

Ms. Barassi-Jackson: "Dr. Anderson."

Dr. Callahan: Q "So Dr. Anderson has told the physicians they can make a case-by-case decision to divert patients?"

Ms. Barassi-Jackson: "Yes."

Dos Santos: "Based on physician discretion?"

Ms. Barassi-Jackson: "Based on their discretion…. they can determine that it's in their best interest to go elsewhere where they're going to get the higher level of care faster."

This permission by FHCC leadership for ED physicians to divert ambulances on a case-by-case basis was reinforced further by this testimony of Ms. Barassi-Jackson to the AIB **(Evidence Folder, Tab 34, Page 17)**:

DAB – J. Dubnow, M.D.                                                                    page 22

Dr. Callahan: "So you said that Dr. Anderson allowed the physicians to make case-by-case decisions?"

Ms. Barassi-Jackson: "Yes."

Dr. Callahan: "Did they receive any guidance or education or expectations about what they can and cannot accept or is it just up to their individual?"

Ms. Barassi-Jackson: "It's up to their individual discretion…. there was [sic] emails back and forth because they wanted to retain the ability that if I already had too many people in the department, I shouldn't bring another one in that's going to sit here."

Dr. Callahan: "So the physician could decline a case just because they were too busy?"

Ms. Barassi-Jackson: "It's supposed to be if it exceeds the capacity of our department."

In addition to the Associate Chief Nurse and the Nurse Manager of the ED being aware of this practice of case-by-case ambulance diversion being practiced by ED physicians, Dr. Anderson's testimony before the AIB is confirmatory. The interested reader is invited to read the testimony of Dr. Anderson before the AIB **(Evidence Folder, Tab 36),** however the reader is likely to find the testimony of Dr. Callahan before the DAB to be more succinct and direct. When Dr. Callahan was asked if Dr. Anderson admitted to the AIB that case-by-case ambulance diversion occurred at FHCC, he answered, "Yes, definitely. And that was a finding of our consultative visit [VISN inspection of October 2016] as well." **(Callahan testimony, Page 296, lines 23— 24).** Dr. Maldonado, the Chief Medical Executive at FHCC and the Proposing Official for the removal of Dr. Dubnow, also provided testimony to the AIB that case-by-case ambulance diversion by ED physicians was both a permitted and long-standing practice **(Evidence Folder, Tab 35, page 6):**

Dr. Callahan: "So if, for example, a patient is coming here by ambulance, and the physician on duty in the ED thinks this is not a patient we can manage here, are you aware that they are having those patients go elsewhere?"

Dr. Maldonado: "Yes, but that's been going on for a long time."

Additionally, during his testimony to the DAB, Dr. Maldonado confirmed that this was a permitted practice on April 29, 2017. When he was asked, "So there's no ambulance that would call into the emergency room and would tell them to go to another facility for any reason other than diversion" he answered, "No, the ambulance

can call the emergency room, yes, and the doctor can defer them to another place…. that's diverting the patient." **(Maldonado testimony, Page 59, lines 13—23)**.

During testimony to the AIB, Dr. Anderson provided testimony regarding the incidence and volume of case-by-case ambulance diversions. He answered that, "it's one here, one three months later. The numbers aren't very much for that. I couldn't give you hard and fast numbers for that right now." **(Evidence File, Tab 36, Page 8, lines 2—21; page 9, lines 17--19)**. The Board appreciates from this testimony that the number of case-by-case ambulance diversions was small and the occurrences were infrequent and not note-worthy.

Additionally, Appellant's Counsel called two FHCC ED physicians as witnesses before the DAB: Dr. Martin and Dr. William Lauth. Dr. Martin was asked if the ED physicians have the capability of diverting ambulances on a case-by-case basis. He stated emphatically, "Of course we do. That's part of our responsibility. Because the care of the patient in the field on the EMS call is your responsibility as a physician. You have to make what's the best decision at the time for that patient." **(Martin testimony, Page 772, lines 11-20)**. He stated that ED physicians make decisions based upon the available resources and capabilities of the ED, and that since April 29, 2017 the ability for the ED physicians to divert ambulances on a case-by-case basis has not been rescinded. **(Martin testimony, Page 771, line 14—page 773, line 22)**.

Dr. Lauth has been an ED physician at FHCC since July 2006 and is currently the Acting Chief of the ED. He too was asked if that on April 29, 2017 ED physicians had the capability of diverting ambulances on a case-by-case basis. He said, "I think we had instruction from our leadership, that at times when we had patients that we knew we couldn't handle, that we could not take care of, that we should reroute them, redirect them, divert them…. we should try to get them to go to some other hospital." **(Lath testimony, Page 807, line 24—page 808, line 11)**. Additionally, he agreed that no one in leadership, specifically, "Dr. Holt, Dr. Maldonado, Dr. Anderson ever prohibited the ED or ED physicians from making case-by-case redirections, diversions, whatever you want to call them." **(Lauth testimony, Page 810, lines 4—9)**. He, like the members of the AIB, acknowledged that the two directives are silent concerning case-by-case ambulance diversion **(Lauth testimony, Page 829, lines 6—12; Page 830, lines 12—15)**, and like Dr. Martin, he acknowledged that the ability for the ED physicians to divert ambulances on a case-by-case basis has not been stopped by FHCC leadership **(Lauth testimony, Page 830, lines 5—9)**.

The Board also heard testimony from the Appellant, Dr. Dubnow, regarding the issues of ED physicians diverting an ambulance on a case-by-case basis and diversion. Regarding the latter, he indicated that there are policies which specify the conditions and circumstances under which the ED would no longer accept non-walk-in patients for

DAB – J. Dubnow, M.D.

treatment. He stated that in contrast to diversion, "Diverting…is the redirection of a patient, an individual patient on a case-by-case basis as we in the ED have been clearly instructed up our chain of command all the way to Dr. Anderson. He wrote me a specific e-mail that said…anybody that comes to the ED, you're going to see them. That's not to say that you can't redirect on a case-by-case basis before they arrive, if you know in advance before they arrive." **(Dubnow testimony, Page 165, lines 5—14;)** He also indicated that on April 29, 2017 ED physicians were not prohibited by leadership to divert ambulances on a case-by-case basis. **(Page 164, line 15—page 165, line 18; Page 176, lines 17—23).**

Regarding this charge, Director Holt testified that, "And again this was sustained based on the findings of the AIB…. there were other cases of diversion that were found in the AIB." **(Holt testimony, Page 387, line 20—page 388, line 9)**.

The Board disagrees with the Director. The Board saw no case of ambulance diversion other than the pediatric case in the Evidence File. Also, the Board heard no testimony from any witness during its three-day session that referenced a specific case of an ambulance diversion other than that of April 29. The Board acknowledges that ED physicians confirmed that they had the FHCC Leadership's blessing to perform case-by-case ambulance diversions, but believes that without specific cases to reference, the Agency failed in its obligation to provide evidence that Dr. Dubnow failed to ensure that his physicians were compliant with the diversion policies in the VHA and JPI directives.

### Charge 5; Specification 1

"Charge 5: Failure to meet standard of care. Specification 1: On or about January 9, 2016 at approximately 5:11 pm, you failed to meet the standard of care for Patient 4 as determined by Management Case Report ID 3001140 when you deviated from the recognized standard of medical care which would have been exercised by practitioners in your field." Charge 5 as proposed by Dr. Maldonado had two additional specifications, however the Board will not comment on the merits of the second and third specification because they were not sustained by the Director.

Findings as to Charge1, The Board concludes that this charge is **not sustained in whole or in part** (by a 3-0 vote).

The Board considered the Review that was performed by Dr. Andrew Butler and is dated November 8, 2017 **(Evidence Folder Tab 48)**. The section of the document labelled "special instructions" does not name the ED physician who allegedly stated, "we don't do OB" to an outpatient provider who wanted the ED physician to evaluate a patient who was less than one month pregnant, and further noted that, "There are very few notes." Dr. Butler's review does not identify the ED physician by name, nor does it confirm that the conversation between the clinic and ED physician even occurred, and

DAB – J. Dubnow, M.D.                                                                    page 25

A-42

noted that, "there was no documentation in medical record data." Additionally, during testimony to the DAB, Dr. Dubnow testified that because he was not working at FHCC on January 9, 2016 it was impossible for him to have refused to evaluate this patient **(Dubnow testimony: Page 189, lines 4—15).** Finally, Mr. Morgan, Agency Counsel, stipulated that the Agency acknowledged that Dr. Dubnow did not work at FHCC on January 9, 2016 **(DAB testimony: Page 792, lines 10—24).**

As indicated above, the Board believes that Dr. Maldonado created Charge 5 of the Proposal for Removal to strengthen the argument that Dr. Dubnow should be removed. First, the Board has concerns regarding the calculus that was used at the VISN-level to send the patient encounters cited in this specification for an outside review, and will discuss that topic further after it discusses the AIB. Next, as indicated previously, Director Holt did not believe that the second and third specifications met the bar to support removal and accordingly did not sustain them. The Board appreciates the Director's sense that the arguments made in those specifications were weak, but is puzzled why he sustained a specification that was based on an alleged conversation that lacked any objective evidence in the patient's medical record that could support the charge. Director Holt was not questioned on this issue by the Board because the Board had already been provided testimony that Dr. Dubnow was not working at FHCC on the date of the alleged incident, January 9, 2016.

## IV. PENALTY DETERMINATION

The DAB overturns the Agency's penalty against the Appellant, Dr. Jeffrey Dubnow. Since joining Federal service at FHCC, Dr. Dubnow has not had a single disciplinary action and has received Outstanding evaluations from his supervisor. The DAB notes that the entirety of this case hinged on Dr. Dubnow's clinical decision to redirect an ambulance that was transporting a 7-month-old code patient from an unknown location to another hospital in close proximity to the FHCC which he knew to be better able to provide definitive care to the patient. The DAB rules that none of the five charges against the Appellant are sustainable.

## V. OTHER FACTORS CONSIDERED

The DAB notes that the Appellant had been afforded Whistleblower status by the VA prior to his removal and that his status as a whistleblower had been inadvertently leaked to top leadership at FHCC. The Board was not presented with any evidence that linked his removal to his status as a whistleblower.

## VI. OTHER RULINGS BY THE BOARD

DAB – J. Dubnow, M.D.                                                                page 26

Not applicable.

## VII.  RECOMMENDED DECISION

The DAB did not sustain any of the five charges which were brought against the Appellant.  The DAB concludes that the Appellant should be reinstated with full restitution of lost wages and benefits.  The DAB advises that his record should be expunged of this adverse action.  The DAB recommends that the Appellant be fully reimbursed for any and all reasonable legal expenses that he incurred to defend himself against this adverse action.

## VIII  REVOCATION/REDUCTION OF CLINICAL PRIVILEGES

The Board did not sustain any of the charges.  Therefore, revocation/reduction of privileges is not reportable to the National Practitioner Data Bank.

DAB – J. Dubnow, M.D.                                                                                 page 27

## BOARD ACTION

| 6. AFTER CAREFUL CONSIDERATION OF ALL FACTORS, THE BOARD RECOMMENDS THAT THE EMPLOYEE BE *(Check one and explain in detail in item 9.)* | 7. RECOMMENDED GRADE AND STEP |
|---|---|

6. AFTER CAREFUL CONSIDERATION OF ALL FACTORS, THE BOARD RECOMMENDS THAT THE EMPLOYEE BE *(Check one and explain in detail in item 9.)*

○ APPOINTED    ○ PROMOTED    ○ GIVEN SPECICAL ADVANCEMENT

○ NOT APPOINTED    ○ DECLARED INELIGIBLE    ⊙ OTHER *(Specify)*

○ NOT PROMOTED      Disciplinary Appeals Board

7. RECOMMENDED GRADE AND STEP

8. PHYSICAL EXAMINATION

○ APPROVED    ○ NOT APPROVED

---

**9. OTHER RECOMMENDATIONS AND ADDITIONAL REMARKS TO SUPPORT RECOMMENDATIONS IN ITEM 6.**

Decision

The Board did not sustain any of the charges for the removal of the Appellant, Dr. Dubnow.  The Board is unanimous that Dr. Dubnow is to be restored in full and that back wages and benefits be restored.  It further recommends complete expungement of his Personnel File.  It also recommends that he be reimbursed for any reasonable legal expenses that he incurred to defend himself in this matter.

---

### 10. SIGNATURE(S) OF INITIATING BOARD MEMBERS  *(All signatures must be dated)*

| A. CHAIRMAN | B. MEMBER |
|---|---|
| Robert J Coleman 183269   Digitally signed by Robert J Coleman 183269 Date: 2018.09.11 10:23:48 -05'00' | HYUN-JU NELSON 542723   Digitally signed by HYUN-JU NELSON 542723 Date: 2018.09.11 16:41:16 -05'00' |

| C. MEMBER | D. MEMBER | E. SECRETARY |
|---|---|---|
| | | Lisa M. Arfons 396707   Digitally signed by Lisa M. Arfons 396707 Date: 2018.09.13 11:26:09 -04'00' |

| 11. Certification of initiating board technical advisor that board action is complete and has been reviewed for adherence to all legal and technical requirements before being forwarded to approving authority. | SIGNATURE | DATE |
|---|---|---|
| | DEBORAH J. MORADEL 147758   Digitally signed by DEBORAH J. MORADEL 147758 Date: 2018.09.11 08:50:12 -05'00' | Sep 11, 2018 |

### REVIEWING BOARD

**12. REVIEWING BOARD RECOMMENDATIONS AND REMARKS**

---

### 13. SIGNATURE(S) OF REVIEWING BOARD MEMBERS  *(All signatures must be dated)*

| A. CHAIRMAN | B. MEMBER |
|---|---|
| | |

| C. MEMBER | D. MEMBER | E. SECRETARY |
|---|---|---|
| | | |

### ACTION BY APPROVING AUTHORITY

| 14. ACTION | 15. DATE | 16. SIGNATURE AND TITLE OF APPROVING AUTHORITY |
|---|---|---|
| ○ APPROVED   ✗ DISAPPROVED | 12/10/8 | *[signature]* (EIC) |